**SPGGC, LLC; Metabank; U.S. Bank, N.A., Plaintiffs, Appellees,**

v.

**Kelly A. AYOTTE, New Hampshire Attorney General, Defendant, Appellant.**

No. 06–2326.

United States Court of Appeals, First Circuit.

Heard April 6, 2007.

Decided May 30, 2007.

factories.

4

David A. Rienzo, with whom Richard W. Head, Senior Assistant Attorney General, New Hampshire Department of Justice, were on brief, for appellant.

Paul W. Shaw, with whom Margaret M. Pinkham and Brown Rudnick Berlack Israels LLP, was on brief, for appellee SPGGC, LLP.

Christine B. Cesare, with whom Bryan Cave LLP, Bruce Felmly, and McLane, Graf, Raulerson & Middleton, P.A., was on brief, for appellee Metabank.

James R. McGuire, with whom Morrison & Foerster LLP, was on brief, for appellee U.S. Bank, N.A.

Douglas B. Jordan, Senior Counsel, Litigation Division, Office of the Comptroller of the Currency, with whom Julie L. Williams, Chief Counsel, Daniel P. Stipano, Deputy Chief Counsel, and Horace G. Sneed, Director, Litigation Division, was on brief for the Office of the Comptroller of the Currency, as amicus curiae in support of appellee U.S. Bank, N.A.

Before TORRUELLA, Circuit Judge, TASHIMA,[*] Senior Circuit Judge, and LIPEZ, Circuit Judge.

TORRUELLA, Circuit Judge.

This is a case about the power of a state to regulate activities of national banks and national thrifts if these activities are carried out by third-party agents. New Hampshire passed a statute restricting the sale of "gift certificates," including stored value giftcards issued by national banks and national thrifts, that carry expiration dates or are subject to administrative fees. New Hampshire Consumer Protection Act, N.H.Rev.Stat. Ann. § 358–A:2 ("New Hampshire CPA"). Plaintiffs SPGGC, LLC, a mall owner ("Simon"), later joined by U.S. Bank, a national bank ("USB"), and Metabank, a national thrift, filed suit against Kelly A. Ayotte, Attorney General of New Hampshire, seeking injunctive relief and a declaratory judgment that the New Hampshire CPA was preempted by the National Banking Act, 12 U.S.C. § 1 et seq., the Home Owners Loan Act, 12 U.S.C. § 1461 et seq. ("HOLA"), and the regulations promulgated thereunder.[1] The district court granted summary judgment to Simon, Metabank, and USB, concluding that the New Hampshire CPA was preempted as applied to products sold by national banks and thrifts. After careful consideration, we affirm.[2]

---

[*] Of the Ninth Circuit, sitting by designation.

1. Simon also argued that the regulations violated the Commerce Clause. Because the district court did not reach this argument and because we agree with the district court that the New Hampshire CPA is preempted by federal law, we need not reach this argument.

2. We acknowledge the assistance provided to the Court by amicus curiae Office of the Comptroller of the Currency.

## I. *Background*

Simon is a subsidiary of the Simon Property Group, a retail shopping mall developer and manager. Simon manages the three largest shopping malls in New Hampshire, as well as a number of other malls throughout the United States. In 2001, Simon contracted with Bank of America ("BoA") to sell Simon-branded stored value giftcards.

Stored value giftcards come in two varieties: retail giftcards and bank-issued giftcards. Retail giftcards are similar to traditional gift certificates in that they are issued by a retailer, are serviced by a retailer or its agent, and can only be used at that retailer. Bank-issued giftcards may be sold by a retailer, but they are issued by a bank, typically carry the logo of a payment network such as Visa or MasterCard, and can be used at any location that accepts debit cards of the same payment network. The giftcards issued by BoA and sold by Simon were bank-issued giftcards. These cards carried an expiration date and were subject to administrative fees that reduced the redeemable value of the card after a certain period of time or after certain events, such as the loss and replacement of the card.

Under the agreement between Simon and BoA, BoA was responsible for the design of the cards, and BoA was identified as the issuer of the giftcard. All proceeds from the sale of BoA-issued giftcards were remitted to Simon, who in turn paid BoA a "transaction fee" for each transaction involving a BoA-issued card. Simon was responsible for marketing, selling, and servicing the BoA-issued giftcards.

On November 1, 2004, Ayotte gave notice to Simon that the Attorney General intended to file an enforcement action pursuant to the New Hampshire CPA to halt the sale of the Simon-branded BoA-issued giftcards. The CPA provides in relevant part:

> It shall be unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state. Such unfair method of competition or unfair or deceptive act or practice shall include, but is not limited to, the following:

> * * *

> XIII. Selling gift certificates having a face value of $100 or less to purchasers which contain expiration dates.... Dormancy fees, latency fees, or any other administrative fees or service charges that have the effect of reducing the total amount for which the holder may redeem a gift certificate are prohibited. This paragraph shall not apply to season passes.

N.H.Rev.Stat. § 358–A:2. On November 12, 2004, Simon filed a declaratory judgment action and request for injunctive relief against Ayotte in the United States District Court for the District of New Hampshire, seeking a declaration that enforcement of the CPA against Simon for the sale of BoA-branded giftcards would be preempted by the National Banking Act. New Hampshire proceeded to file a civil complaint against Simon in the New Hampshire Superior Court on November 15, 2004, alleging that Simon violated the CPA by selling giftcards with an expiration date and administrative fees. Simon filed a motion to dismiss the civil complaint on the ground that its giftcards were not "gift certificates" within the definition of the CPA. The Superior Court found that the Simon-branded BoA-issued giftcards were "gift certificates" within the definition of the CPA, and denied Simon's motion to dismiss, but stayed all further proceedings pending the outcome of the

federal action. On August 31, 2005, Simon moved for summary judgment in the federal declaratory judgment action.

In September 2005, Simon terminated its relationship with BoA, and entered into contracts with USB to sell Simon-branded USB-issued giftcards at Simon malls, and with Metabank to sell Simon-branded Metabank-issued giftcards over the internet. USB is a federally chartered bank ("national bank") regulated by the federal Office of the Comptroller of the Currency ("OCC"). Metabank is a federally chartered thrift ("national thrift") regulated by the federal Office of Thrift Supervision ("OTS").

Simon's contract with USB states that USB shall be considered the "issuer" of the giftcards sold under the contract, and that the giftcards are to be "national bank products within the meaning of the National Bank Act for all purposes, including the principles of federal preemption." According to the contract, USB issues the giftcards and then provides a stock of cards to Simon. Simon then markets the giftcards to consumers. Consumers who wish to purchase a gift card provide Simon with some form of payment, which Simon remits to USB. Simon then electronically "loads" the stored value onto the card and gives the card to the consumer, along with the disclosures provided by USB. Simon is paid a commission for each gift card sold. From this point forward, the purchaser of the gift card has a contractual relationship only with USB. USB is responsible for servicing the card and is liable for charges upon it. Any fees associated with the card are set and collected by USB, and if the card is reported lost or misused, USB may be liable to the consumer for fraudulent charges. Simon has no authority under the contract to alter the terms and conditions of the agreement between USB and the consumer. Metabank's agreement

with Simon is substantially similar to Simon's agreement with USB.

According to Metabank and USB, some amount of administrative fees are necessary to make their giftcard business economically viable. In addition, Metabank and USB have stated that Visa, who provides payment processing services for the giftcards, requires that the cards include an expiration date. According to Metabank and USB, the expiration date provides security so that the card's identity can be verified by seeing if the card number and expiration date match in a database.

The USB giftcards themselves resemble a credit card in physical appearance. They are about 3 3/8 inches long by 2 1/4 inches wide. The card has the Visa logo along with a hologram in the front bottom right corner. Sixteen raised digits appear on the front of the card, below which is an expiration date. The top of the card identifies it as a "Simon Giftcard;" the USB logo is also prominently displayed. On the reverse of the card, there is a strip emblazoned with the Visa logo for the customer's signature and a statement that use of the gift card is governed by the terms of the "cardholder agreement," that an administrative fee of $2.50 per month will be deducted beginning thirteen months after the card is purchased, and that the card will expire on the date printed on the front of the card. The card also states: "This card is issued by and the property of U.S. Bank National Association, pursuant to a license from Visa U.S.A. Inc., and must be returned upon request."

The "U.S. Bank Simon Giftcard Cardholder Agreement" indicates that the agreement is between USB and the consumer. The agreement states the schedule of fees, the expiration date, indicates that the card "may be used when making purchases from any merchant that accepts

Visa debit cards," and states that USB "may be liable for failure to complete transactions." The agreement also explicitly limits USB's liability for certain transactions and notes that USB "may revoke the Giftcard at any time without cause or notice." The Agreement is printed on a brochure that accompanies the card. The brochure states that the card is "issued by USB," and that it may be purchased at a Simon mall or at the Simon website.[3]

Both Metabank and USB moved to intervene in the declaratory judgment action. The district court granted both parties' motions.

On August 1, 2006, the district court granted Simon's motion for summary judgment. The district court found that the National Bank Act and HOLA authorized nationally chartered banks and thrifts respectively to sell stored-value giftcards as a banking product, and that the New Hampshire CPA substantially frustrated the ability of Metabank and USB to sell giftcards in New Hampshire. As such, the district court found that the National Bank Act and HOLA preempted the CPA with respect to products issued by nationally chartered banks and thrifts.

## II. Discussion

■ We review a district court's determination that a state statute is preempted *de novo.* *Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co.,* 215 F.3d 136, 139 (1st Cir.2000).

■ The doctrine of federal preemption is rooted in the Supremacy Clause, which provides that "the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Federal statutes and the regulations adopted thereunder have equal preemptive effect. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982). A federal statute or regulation may preempt a state regulatory scheme in three relevant ways.[4] First, Congress can expressly preempt state law by explicit statutory language. *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). Second, Congress can enact a regulatory scheme "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," *id.* at 31, 116 S.Ct. 1103 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)), also known as "field preemption". In such cases, state regulation will be invalid even if it does not directly conflict with federal laws or regulations. *See, e.g., Cloverleaf Butter Co. v. Patterson,* 315 U.S. 148, 167–68, 62 S.Ct. 491, 86 L.Ed. 754 (1942). Third, "federal law may be in 'irreconcilable conflict' with state law," *Barnett Bank,* 517 U.S. at 31, 116 S.Ct. 1103 (quot-

---

3. The Metabank-issued giftcard does not appear significantly different from the USB-issued card.

4. A fourth species of preemption, "complete preemption," exists where a federal cause of action has completely supplanted a state law cause of action, and thus converts the state claim into a federal claim. *See, e.g., Caterpillar, Inc. v. Williams,* 482 U.S. 386, 393, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Complete preemption allows a plaintiff to bring a previ-

ously state-law claim into federal court under federal question jurisdiction, 28 U.S.C. § 1331. *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 24, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). No party disputes that the district court had subject-matter jurisdiction over Simon's claims under § 1331 because they raise federal questions. Accordingly, the doctrine of complete preemption is inapplicable here.

ing *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982)), also known as "conflict preemption." This may occur when compliance with both state and federal statutes and regulations is a physical impossibility, or when compliance with the state statute would frustrate the purposes of the federal scheme. *Id.* Simon, USB, and Metabank argue that conflict preemption prohibits Ayotte from enforcing the New Hampshire CPA against Simon because the CPA conflicts with federal statutes and regulations authorizing national banks and thrifts to issue gift cards with expiration dates and administrative fees and to sell the cards through third party agents. Because USB and Metabank's activities are regulated under different statutory schemes, we address their preemption claims separately.

### A. The National Bank Act

██ █ The National Bank Act provides that a nationally chartered bank shall have the power "[t]o exercise by its board of directors or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24, Seventh. The Supreme Court has consistently recognized this grant of incidental powers as a "grant[ ] of authority not normally limited by, but rather ordinarily preempting, contrary state law." *Barnett Bank*, 517 U.S. at 32, 116 S.Ct. 1103; *see also Franklin Nat'l Bank v. New York*, 347 U.S. 373, 378, 74 S.Ct. 550, 98 L.Ed. 767 (1954) (deciding that a national bank's incidental power to advertise for deposits preempts state law limiting such advertising); *First Nat'l Bank v. California*, 262 U.S. 366, 369–70, 43 S.Ct. 602, 67 L.Ed. 1030 (1923) (finding that a national bank's statutory deposit-taking power preempts state statute limiting its ability to take deposits). Thus, a state law may be preempted by the National Bank Act when it frustrates or limits the ability of a national bank to exercise its statutorily granted powers. *See Barnett Bank*, 517 U.S. at 33–34, 116 S.Ct. 1103. Accordingly, to determine whether the National Bank Act preempts the enforcement of the New Hampshire CPA, we must first determine whether a national bank's enumerated and incidental powers include the issuance of stored-value giftcards with expiration dates and administrative fees and the marketing and sale of those giftcards through third party agents. If a national bank has these powers, we must then determine whether the CPA limits the bank's ability to exercise that power.

There is little dispute in this case that a national bank has the power to issue stored value cards that carry expiration dates and administrative fees. The OCC has determined that the issuance and sale of electronic stored value systems, such as giftcards, is an activity incidental to the business of banking. 12 C.F.R. § 7.5002(a)(3); OCC Bulletin No. 98–31, Guidance on Electronic Financial Services & Consumer Compliance, (July 30, 1998), *available at* 1998 WL 460874 at *8. Furthermore, the OCC has issued regulations that require the disclosure of expiration dates and administrative fees on giftcards, which indicates that the OCC expects that cards might carry expiration dates and fees, and that they are not prohibited from doing so. OCC Bulletin 2006–34, Gift Card Disclosures (Aug. 14, 2006), *available at* 2006 WL 2384741 at *2; OCC Bulletin No. 96–48, Stored Value Card Systems (Sept. 10, 1996), *available at* 1996 WL 528481 at *2 ("Each [stored value] system could have specific features such as limits on the amount of electronic cash that can be stored or cards that expire after some established time period."). In fact, the OCC stated in its amicus brief to this Court that it believes that its regulations

may require expiration dates on stored-value cards as a matter of sound banking practice. *See* OCC Bulletin No. 96–48 at *8 ("Effective controls, audit coverage, and other preventive measures should be in place to deter or minimize the impact of fraud, counterfeiting, and other improper activities."). We must defer to these regulations because they are not "unreasonable, unauthorized, or inconsistent." *Ridgway v. Ridgway,* 454 U.S. 46, 57, 102 S.Ct. 49, 70 L.Ed.2d 39 (1981) (cited favorably in *Fid. Fed. Sav. & Loan Ass'n,* 458 U.S. at 153, 102 S.Ct. 3014); *see also Chevron U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."). Thus, we conclude that the National Bank Act gives a national bank the authority to issue and sell stored value giftcards such as the ones at issue in this case.

■ Having determined that it is within a national bank's powers to issue and sell the giftcards at issue here, we must determine whether the National Bank Act gives national banks the power to engage third party agents to market and sell the giftcards. The National Bank Act explicitly states that a national bank may use "duly authorized officers or agents" to exercise its incidental powers. 12 U.S.C. § 24, Seventh. The OCC adds that it has explicitly allowed banks to use agents to carry out bank activities. *See, e.g.,* Preemption Determination (Michigan Motor Vehicles Sales Act), 66 Fed.Reg. 28,593 (May 23, 2001) (allowing agents to market automobile loans); 12 C.F.R. § 7.1014 (allowing agents to sell bank-issued money orders). At least one other circuit has suggested

that national banks may use agents to perform activities authorized by the National Bank Act. *See Cades v. H & R Block,* 43 F.3d 869, 873–74 (4th Cir.1994) (finding that 12 U.S.C. § 85 requires that a national bank's home state usury laws apply, when the bank had used out-of-state agents to engage in "face-to-face solicitation of . . . consumers"). Accordingly, we agree with USB and Simon that the National Bank Act authorizes national banks to engage agents to carry out some of their activities.

■ Because the National Bank Act confers on national banks the power to issue stored value gift cards like those at issue here and to market and sell them through third party agents, we consider whether the New Hampshire CPA frustrates the exercise of that power. The New Hampshire CPA prohibits the sale of a giftcard with a value of less than $100 that carries an expiration date or administrative fees. Ayotte argues that this regulation does not conflict with the National Bank Act or OCC regulations because it regulates only Simon, a company that is not a bank. Ayotte notes that no enforcement action was brought against USB. But this analysis is too formalistic: the question here is not *whom* the New Hampshire statute regulates, but rather, against *what activity* it regulates. *See Watters v. Wachovia Bank, N.A.,* 550 U.S. ——, 127 S.Ct. 1559, 1570, 167 L.Ed.2d 389 (2007) ("We have never held that the preemptive reach of the [National Bank Act] extends only to a national bank itself. Rather, in analyzing whether state law hampers the federally permitted activities of a national bank, we have focused on the exercise of a national bank's *powers* . . . ." (emphasis in original)). For example, in *Franklin National Bank,* the Supreme Court decided that the National Bank Act preempted local regulations that prohibited banks from

advertising that they accepted "savings." 347 U.S. at 378, 74 S.Ct. 550. The Court stated that because national banks were given the power to "accept and pay interest on time deposits of people's savings . . . they must be deemed to have the right to advertise that fact." *Id.* It is true that the state regulation at issue in *Franklin National Bank* applied only to national banks themselves. However, we do not believe that the regulation at issue in *Franklin National Bank* would have presented any less of a conflict with the National Bank Act if it indirectly restricted a national bank's power by prohibiting New York advertising firms from using the word "savings" when preparing advertising for a bank, or if it had prohibited billboard owners from posting signs for banks that included the word "savings." The point of *Franklin National Bank* was that the New York regulation impeded the ability of a national bank to carry out one of its statutorily granted powers, the power to accept deposits.

The New Hampshire CPA is no different. New Hampshire's CPA regulates the terms and conditions of the giftcards issued by USB, *i.e.,* expiration dates and administrative fees. These terms govern the relationship between the purchaser of the giftcard and USB. Simon plays no role in defining this relationship and has no role in managing it; USB has sole control over these terms and conditions and is solely responsible for compliance with them. Thus, the New Hampshire CPA is not concerned with Simon's activity, which is limited to how and where the giftcards are marketed,[5] but rather with the sale of certain giftcards through a third party agent, which is the activity of USB, a national bank. Even if the CPA does not directly prohibit USB from engaging in

such activity, it does so indirectly by prohibiting Simon from acting as USB's agent. It would be contrary to the language and intent of the National Bank Act to allow states to avoid preemption of their statutes simply by enacting laws that prohibited non-bank firms from providing national banks with the resources to carry out their banking activities. As such, the New Hampshire CPA regulates the activities of a national bank.

Ayotte also contends that neither the National Bank Act nor OCC regulations specifically require giftcards to have expiration dates or administrative fees, and as such, are not in conflict with the New Hampshire CPA. The Supreme Court has directly answered this argument by holding that conflict preemption is implicated in situations beyond those where a federal law requires something that a state law prohibits. *See Barnett Bank,* 517 U.S. at 35, 116 S.Ct. 1103. Instead, the Court says, the preemptive scope of the National Bank Act is broader because it says that national banks "may" engage in certain activities and "the word 'may' . . . does not condition federal permission upon that of the State." *Id.; see also Wachovia Bank, N.A. v. Burke,* 414 F.3d 305, 314 (2d Cir. 2005) ("[S]tate regulation is preempted if it will 'significantly interfere with the national bank's exercise of its powers.'" (quoting *Barnett Bank,* 517 U.S. at 33, 116 S.Ct. 1103)). We have held that the National Bank Act gives USB the power to issue the giftcards at issue in this case and sell them through a third party agent such as Simon. New Hampshire's CPA prohibits Simon from selling the USB-issued giftcards. Because the New Hampshire CPA "significantly interferes" with USB's statutory power, it is preempted by the National Bank Act.

---

**5.** We express no opinion as to whether state regulation of these aspects of a giftcard pro-

gram might be preempted by the National Bank Act.

■ Ayotte cites three district court cases in favor of the Attorney General's argument that the CPA is not preempted: *Colorado ex rel. Salazar v. ACE Cash Express, Inc.*, 188 F.Supp.2d 1282 (D.Colo. 2002), *Carson v. H & R Block, Inc.*, 250 F.Supp.2d 669 (S.D.Miss.2003), and *SPGGC, Inc. v. Blumenthal*, 408 F.Supp.2d 87 (D.Conn.2006). Ayotte's reliance on these cases is misplaced. In *Salazar*, the only question presented was whether the defendant non-bank could remove a state enforcement action based on usury laws from state court to federal court on the basis of the complete preemption doctrine; the district court held that it could not. 188 F.Supp.2d at 1283–84. But as we noted earlier, the doctrine of complete preemption determines whether a federal court has jurisdiction over a claim, not whether a state enforcement action would be precluded on the merits by federal preemption. *supra* note 4. *Salazar* did not resolve the question of whether a state regulation that prohibited a bank's third party agent from carrying out bank activities would be preempted by the National Bank Act, and as such, we do not find it persuasive here.

*Carson* is even less persuasive. In *Carson*, as in *Salazar*, the district court granted a motion to remand based on the lack of federal jurisdiction because it rejected the defendant non-bank's complete preemption argument. 250 F.Supp.2d at 673–75. However, unlike *Salazar*, the statute at issue in *Carson* did not prohibit a banking activity, but rather prohibited the third party agent from misrepresenting the bank products it was selling. *Id.* at 673.

This type of statute, which regulates the actions of the third party agent rather than a bank product, is unlike the New Hampshire CPA, which seeks to prohibit the sale of the bank product itself. Thus, *Carson* is inapposite here.

Finally, *SPGGC* is also factually distinguishable. In *SPGGC*, Connecticut regulators were attempting to regulate the sale of BoA-issued giftcards by Simon. 408 F.Supp.2d at 94–95. As we have already noted, Simon's arrangement with BoA differed from Simon's present relationship with USB because in the arrangement with BoA, Simon set and collected all of the fees from the sale of the giftcards and managed the giftcard program. BoA's role in the arrangement was limited to issuing the card and collecting a transaction fee that would be paid to it when the card was used. *See id.* at 94. We do not decide today whether BoA's involvement in that arrangement would be sufficient to implicate the National Bank Act; it is sufficient to say that here, where Simon's role is limited to acting as USB's agent in marketing and selling the giftcards, the facts of the case support a finding of preemption.[6] Accordingly, we find that the National Bank Act and the regulations promulgated thereunder by the OCC preempt the enforcement of New Hampshire's CPA so as to prohibit Simon from selling national bank-issued giftcards that carry expiration dates and administrative fees.

## B. The HOLA

■ The HOLA directs the OTS to "provide for the organization, incorpo-

---

6. We also reject Ayotte's assertion that the OCC has specifically stated that the New Hampshire CPA should apply to Simon's activities. Ayotte cites a letter from the OCC to Thomas F. Reilly, the then-Attorney General of Massachusetts, which states that the OCC "do[es] not believe the state restrictions on Simon's fees would be preempted...." However, this letter was giving the OCC's opinion as to whether a Massachusetts regulation would apply to the gift card program that previously existed between Simon and BoA, which is factually distinct from the program at hand here. The OCC's letter has no relevance to the present litigation.

ration, examination, operation, and regulation of ... Federal savings associations." 12 U.S.C. § 1464(a). The Supreme Court has stated that "[i]t would have been difficult for Congress to give the [OTS] a broader mandate." *de la Cuesta,* 458 U.S. at 161, 102 S.Ct. 3014 (first alteration in original) (quoting *Glendale Fed. Sav. & Loan Ass'n v. Fox,* 459 F.Supp. 903, 910 (C.D.Cal.1978)). OTS regulations explicitly state that they are "preemptive of any state law purporting to address the subject of the operations of a Federal savings association." 12 C.F.R. § 545.2; *see also Bank of Am. v. City & County of S.F.,* 309 F.3d 551, 558 (9th Cir.2002) ("[S]ince the passage of the HOLA in 1933, OTS regulations have governed the 'powers and operations of every federal savings and loan association from its cradle to its corporate grave.' "). As with the National Bank Act, we must determine if OTS regulations allow a national thrift to issue giftcards with expiration dates and administrative fees, if a national thrift may engage third party agents to market and sell those giftcards, and if the New Hampshire CPA conflicts with those regulations.

The HOLA allows a national thrift to accept deposits and to issue evidence of those deposits. 12 U.S.C. § 1464(b)(1)(A); *see also* 12 C.F.R. § 557.10. The OTS has promulgated regulations that allow national thrifts to transfer those deposits to a third party at the customer's direction. 12 C.F.R. § 545.17. The OTS permits national thrifts to use "electronic means or facilities to perform any function" of a national thrift. 12 C.F.R. § 555.200(a). The OTS has interpreted these regulations to allow

national thrifts to issue stored value giftcards. *See* Office of Thrift Supervision, *Gift Card Programs* (Feb. 28, 2007), *available at* http://www.ots.treas.gov/docs/2/ 25254.pdf.[7] The OTS's guidance on giftcards explicitly provides that the giftcard terms and conditions should state the expiration date and the amount of any "service" or "maintenance fees." *Id.* at 2. As with the National Bank Act, this indicates that the OTS has allowed national thrifts to issue giftcards with such terms. Ayotte has not argued that these regulations are "arbitrary, capricious, or manifestly contrary to the [HOLA]," and absent such a showing, we defer to the OTS's interpretation of the statute. *Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. Thus, we conclude that OTS regulations permit national thrifts to issue stored value giftcards with expiration dates and administrative fees, such as the ones issued by Metabank.

The HOLA and OTS regulations also allow national thrifts to engage third party agents to assist in the exercise of national thrift powers. First, the HOLA itself envisions the use of third party agents; it requires that a national thrift provide the OTS with "prompt and complete access" to its agents for regulatory purposes. 12 U.S.C. § 1464(d)(1)(B)(ii). In addition, the OTS has issued an opinion that states that national thrifts may use third parties to market and sell their financial products:

> Federal savings associations have the ability to decide how they market and solicit their banking products and services, subject to [the] OTS's regulatory oversight. This principle is not abrogated, nor should state license and

7. When a consumer purchases a giftcard from a thrift, she provides a "deposit" to the thrift from which she can draw pursuant to the giftcard terms and conditions. In exchange, the thrift issues the consumer a giftcard, which is "evidence" of the deposit. When a consumer uses the giftcard to make a pur-

chase, the thrift then "transfers" the money from the giftcard account to the seller via a provider network such as VISA. Thus, it is not unreasonable for the OTS to view the issuance of giftcards as an innovative exercise of a national thrift's deposit and transfer powers.

registration requirements become applicable, merely because an association contracts with a third party to perform marketing, solicitation, and customer service activities.

Office of Thrift Supervision Opinion Letter No. P–2004–7, Authority of a Federal Savings Association to Perform Banking Activities through Agents Without Regard to State Licensing Agreements 10 (Oct. 25, 2004) (footnote omitted), *available at* http://www.ots.treas.gov/docs/5/560404.pdf. Moreover, OTS guidance on giftcards specifically mentions this power: "Use of third parties [to administer gift card programs] is appropriate provided thrifts follow OTS guidance on such arrangements." *Gift Card Programs, supra,* at 4 n. 11. Thus, we conclude that the HOLA and OTS regulations allow a national thrift to engage third parties to market and sell stored value giftcards. *Cf. State Farm Bank, F.S.B. v. Burke,* 445 F.Supp.2d 207, 218–220 (D.Conn.2006) (finding that a national thrift's agents were subject to regulation by the OTS, rather than a state, where the OTS had allowed the thrift to engage in selling certificates of deposit).

As with the National Bank Act and OCC regulations regarding the sale and marketing of stored value giftcards by third parties, the HOLA and OTS regulations permit Metabank to use third party agents such as Simon to sell stored value giftcards over $100 with expiration dates and administrative fees, whereas the New Hampshire CPA prohibits third party agents from selling the Metabank-issued cards. Thus, the New Hampshire CPA indirectly prohibits a national thrift from exercising powers granted to it under the HOLA and OTS regulations. Therefore, the enforcement of the New Hampshire CPA against Simon for selling Metabank-issued giftcards would frustrate the purpose of the HOLA and the OTS regulations enacted thereunder in allowing national thrifts to sell stored value giftcards through third party agents, and as such, we find an "irreconcilable conflict" between them. *See Barnett Bank,* 517 U.S. at 31, 116 S.Ct. 1103. Thus, we conclude that the HOLA and OTS regulations preempt the New Hampshire CPA as it is applied to Simon's sale of the giftcards at issue here.

### III. *Conclusion*

Our holding should not be interpreted as opining on the adequacy of OCC or OTS regulation of giftcard sales by third party agents; we urge those bodies to ensure that these activities are adequately regulated. Nor does our ruling preclude a state from enacting laws that regulate activities of national banks or national thrifts, so long as those laws do not conflict with the powers granted to national banks or national thrifts by the National Bank Act and the HOLA. *Watters,* 127 S.Ct. at 1567. Nevertheless, for the foregoing reasons, we find that the OCC and OTS are entitled to regulate the terms and conditions of giftcards sold by national banks and national thrifts and that their regulations preempt the New Hampshire CPA inasmuch as it prohibits Simon from selling national bank- and national thrift-issued giftcards with expiration dates and administrative fees. Thus, we affirm the judgment of the district court.

*Affirmed.*