U.S. BANK NATIONAL ASSOCIATION
d/b/a Elan Financial Services,
Plaintiff,

v.

James M. SCHIPPER, in his official capacity as Superintendent of the Iowa Division of Banking and Superintendent of Savings and Loan Associations, and Administrator of Electronic Transfer Funds, Iowa Division of Banking; and JoAnn M. Johnson, in her official capacity as Superintendent of the Iowa Division of Credit Unions and Administrator of Electronic Transfer of Funds, Iowa Division of Credit Unions, Defendants.

No. 4:10–cv–00064–JEG.

United States District Court,
S.D. Iowa,
Central Division.

Aug. 29, 2011.

James R. McGuire, Morrison & Foerster LLP, San Francisco, CA, Thomas D. Hanson, Hanson Bjork & Russell LLP, Des Moines, IA, for Plaintiff.

Jeffrey C. Peterzalek, Jessica Jean Whitney, Iowa Attorney General, Des Moines, IA, for Defendants.

**ORDER**

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on Motion for Summary Judgment brought by Plaintiff U.S. National Bank Association d/b/a Elan Financial Services (U.S. Bank). Defendants Iowa Division of Banking Superintendent James M. Schipper (Schipper) and Iowa Division of Credit Unions Superintendent JoAnn M. Johnson (Johnson) (hereinafter, collectively the State) resisted and filed a Cross–Motion for Summary Judgment. The Court held a hearing on the motions on May 17, 2011. Attorneys James R. McGuire and Thomas D. Hanson represented U.S. Bank. Attorney Jessica Jean Whitney represented Defendants. The matter is fully submitted and ready for disposition.

**I. BACKGROUND**

U.S. Bank is a national bank organized under the National Bank Act (NBA), 12 U.S.C. § 21 et seq., that provides electronic transfer of funds (EFT) services to financial institutions throughout the United States. Schipper and Johnson serve as administrators of the Iowa Electronic Transfer of Funds Act (the Iowa EFTA), Iowa Code Chapter 527, which regulates the transmission of information between satellite terminals, including automatic teller machines (ATMs) and point-of-sale terminals, and financial institutions. This Court previously summarized the process by which ATMs operate and the relevant provisions of the Iowa EFTA in *Farmers State Bank v. Gronstal,* 598 F.Supp.2d 960, 963 (S.D.Iowa 2009):

ATMs work by sending the information on an ATM card to the bank issuing the card. By communicating with the cardholder's bank, the ATM can determine whether to authorize or deny the cardholder's requested transaction. The connection between the ATM and the bank is accomplished by means of a network similar to the Internet. The Iowa EFTA sets forth two entities that can provide and operate the network—data processing centers (DPCs) and central routing units (CRUs)—and requires all ATMs in Iowa to be directly connected to either a DPC or a CRU. *See* [Iowa Code] § 527.5(8).

While similar, there are important distinctions between DPCs and CRUs and the types of transactions that they can handle. There are two basic types of

transactions, referred to informally as "on-us" and "not-us." An on-us transaction occurs when a cardholder uses an ATM belonging to the bank named on the card, whereas a not-us transaction occurs when a cardholder uses an ATM not belonging to the bank named on the card.

DPCs can authorize both on-us and not-us transactions if the DPC to which the ATM is connected has access to the balance account files (BAF) of the cardholder's bank. When an ATM sends a transaction to a DPC that cannot authorize the transaction (because it does not have access to the BAF of the cardholder's bank), the DPC must forward the request to a CRU for authorization. If an ATM is not connected to a DPC, it can alternatively be connected directly to a CRU, which can authorize any transaction.

The Iowa EFTA requires nondiscriminatory and interoperable consumer access to ATMs within the state of Iowa. Nondiscriminatory consumer access is obtained by requiring all CRUs to maintain a direct connection to all DPCs that are directly connected to Iowa ATMs. *See id.* § 527.9(2)(f). Interoperable consumer access is achieved by requiring CRUs to be able to receive and route all transmissions from ATMs anywhere in Iowa. *See id.* § 527.9(2)(e).

An entity that seeks to operate as a CRU in Iowa must disclose information about the CRU to an Iowa EFTA administrator and receive written approval from an Iowa EFTA administrator. *See* Iowa Code § 527.9(1)-(2). An entity operating a CRU within the state of Iowa must "include public representation on any board setting policy for the [CRU]," by allowing the administrators to appoint at least four public members to the board. *Id.* § 527.9(5)(a). Further, the public members appointed must be granted full participation and voting rights and must "repre-

sent the interest of consumers and the business and agricultural communities in establishing policies for the [CRU]." *Id.* § 527.9(5)(c). Finally, a CRU "operating under the approval of the administrator shall be subject to examination by the administrator for the purpose of determining compliance with [the Iowa EFTA]." *Id.* § 527.9(4).

The Iowa EFTA includes broad enforcement provisions, including a grant of authority to the administrators to "issue any order necessary to secure compliance with or prevent a violation of [the Iowa EFTA]," and the administrators may subject a violator "to a civil penalty not to exceed one thousand dollars for each day the violation continues." *Id.* § 527.3(8). An administrator may also request that Iowa's attorney general "institute any legal proceedings necessary to obtain compliance with an order of the administrator or to prosecute a person for a violation of the [Iowa EFTA]." *Id.*

U.S. Bank has provided Farmers State Bank (FSB), an Iowa state-chartered bank, with EFT services for on-us transactions since 2006. Although U.S. Bank seeks to provide FSB and other Iowa state-chartered banks with CRU services necessary to complete not-us transactions, U.S. Bank has not been able to do so because it is not an approved CRU. Only one company, SHAZAM, has been approved by the Iowa EFTA administrator as a CRU. In order to process all of FSB's transactions, U.S. Bank routes FSB's not-us transactions through SHAZAM and reimburses FSB for the fees charged by SHAZAM, which range from two to eight cents per transaction. U.S. Bank also provides EFT services to four other state-chartered banks but does not reimburse those four state-chartered banks for fees incurred from routing information through SHAZAM.

On April 24, 2007, representatives from FSB met with Thomas B. Gronstal (Gronstal), who was then the Iowa Superintendent of Banking and an Iowa EFTA administrator, regarding whether "state-chartered banks such as [FSB] do not have to comply with the provisions of [the Iowa EFTA] when the entity providing services to [FSB] is a national bank." Gronstal Letter, Pl.'s Appl. in Supp. of Pl.'s Mot. Summ. J. 25., ECF No. 25–3. On June 12, 2007, Gronstal provided an informal response by letter and explained to FSB that assuming *arguendo* a nationally-chartered bank could not be obligated to comply with the Iowa EFTA, "it appears to me that state-chartered banks still must comply with all requirements of [the Iowa EFTA], including section 527.5(8), even if they are receiving services from a nationally-chartered bank." *Id.*

U.S. Bank filed this action on February 16, 2010, seeking a declaration that the State may not enforce Iowa Code §§ 527.5 and 527.9 against U.S. Bank or any other financial institution that engages in business with U.S. Bank because Iowa Code §§ 527.5 and 527.9 are preempted by the NBA. U.S. Bank also seeks to permanently enjoin Defendants from enforcing §§ 527.5 and 527.9 against U.S. Bank and those financial institutions for which U.S. Bank provides EFT services.

## II. DISCUSSION

### A. Summary Judgment Standard

On these cross-motions for summary judgment, "[s]ummary judgment in favor of [U.S. Bank] is appropriate only if, after viewing the evidence in the light most favorable to [the State] and affording [the State] all reasonable inferences, there are no genuine issues of material fact and [U.S. Bank is] entitled to judgment as a matter of law." *Lexicon v. ACE Am. Ins. Co.*, 634 F.3d 423, 425 (8th Cir.2011) (citing *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 984 (8th Cir.2009); Fed.R.Civ.P. 56(a)). U.S. Bank and the State agree that no genuine issues of material fact exist and that the case is ripe for disposition on summary judgment. *Cf. Jankovitz v. Des Moines Indep. Cmty. Sch. Dist.*, 421 F.3d 649, 653 (8th Cir.2005) ("Where, as here, the unresolved issues are primarily legal, rather than factual, summary judgment is particularly appropriate."); *Nat'l Bank of Commerce v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir.1999) (noting that the issue of "[p]reemption is a question of law").

### B. Preemption

■■■ "The general law of preemption is grounded in the Constitution's command that federal law shall be the supreme Law of the Land." *Lefaivre v. KV Pharm. Co.*, 636 F.3d 935, 938 (8th Cir.2011) (internal quotation marks and citations omitted); *see also Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007) ("Nearly 200 years ago, in *M'Culloch v. Maryland*, [17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579] (1819), this Court held federal law supreme over state law with respect to national banking."). "Whether a particular federal statute preempts state law depends upon congressional purpose." *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.*, 621 F.3d 781, 791 (8th Cir. 2010). "Federal regulations have no less preemptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).

■■■ "Preemptive intent may be indicated through a statute's express language or through its structure and purpose. A state law is expressly preempted when a federal statute states the congressional intention to preempt state law by defining the scope of preemption." *In re Aurora*, 621 F.3d at 792 (internal quotation marks

and citation omitted). A state law may also be impliedly preempted

> where a federal statutory or regulatory scheme is so pervasive in scope that it occupies the field, leaving no room for state action—this is termed field preemption. Implied preemption also occurs where state law has not been completely displaced but is superseded to the extent that it conflicts with federal law—this is known as conflict preemption.

*Id.* (internal quotation omitted). U.S. Bank contends that conflict preemption is at issue in this case.

■ Conflict preemption manifests itself in two forms—impossibility preemption and obstruction preemption. *Lefaivre,* 636 F.3d at 939. Impossibility preemption "is a demanding defense," *id.* (quoting *Wyeth v. Levine,* 555 U.S. 555, 129 S.Ct. 1187, 1199, 173 L.Ed.2d 51 (2009)), that "arises when compliance with both federal and state regulations is a physical impossibility," *id.* (quoting *Wis. Pub. Intervenor v. Mortier,* 501 U.S. 597, 605, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991)). "Obstruction preemption exists 'when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Wis. Pub. Intervenor,* 501 U.S. at 605, 111 S.Ct. 2476); *see also Bank One v. Guttau,* 190 F.3d 844, 847 (8th Cir.1999) ("Where state law stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' it may be found to be preempted." (quoting *Barnett Bank of Marion Cnty., N.A. v. Nelson,* 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996))).

## C. National Bank Act

■ "Business activities of national banks are controlled by the [NBA], 12 U.S.C. § 1 *et seq.,* and regulations promulgated thereunder by the Office of the Comptroller of the Currency (OCC)." *Watters,* 550 U.S. at 6, 127 S.Ct. 1559. "Except to the extent that authority to issue such rules and regulations has been expressly and exclusively granted to another regulatory agency, the Comptroller of the Currency is authorized to prescribe rules and regulations to" regulate national banks. 12 U.S.C. § 93a. Thus, the Comptroller "has discretion to authorize activities beyond those specifically enumerated," in the NBA to further define national banks' incidental powers. *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 258 n. 2, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995). "[G]rants of both enumerated and incidental 'powers' to national banks [are] grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank,* 517 U.S. at 32, 116 S.Ct. 1103. However, "[f]ederally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." *Watters,* 550 U.S. at 11, 127 S.Ct. 1559 (citations omitted).

■ To determine whether the NBA preempts the Iowa EFTA in the context at issue in this case, the Court must determine whether (1) U.S. Bank seeks to exercise an authorized power under the NBA, and (2) if so, whether the exercise of that power has been prevented or significantly impaired by the Iowa EFTA.[1] *See id.* at

---

1. The State also suggests that the Dodd–Frank Wall Street Reform and Consumer Protection Act, Public Law No. 111–203, § 5136(b)(1)(B), 124 Stat. 1376 (2010), raised the standard for NBA preemption. However, the Dodd–Frank Act adopts the same stan-

dard applied by the *Watters* court, that is, "State consumer financial laws are preempted, only if ... in accordance with the legal standard for preemption in the decision of the Supreme Court of the ... *Barnett Bank* ..., the State consumer financial law prevents or

12–15, 127 S.Ct. 1559; *Barnett Bank,* 517 U.S. at 33–34, 116 S.Ct. 1103 (concluding that a state law that prevents or limits a national bank's ability to exercise federally granted powers is preempted by the NBA).

The parties agree that "U.S. Bank's provision of EFT services falls within the scope of activities that are permissible for a national bank," Defs.' Br. in Resistance to Pl.'s Mot. Summ. J. 11, ECF No. 29; however, the State disputes whether "the general OCC regulations authorizing U.S. Bank to engage in EFT activities are sufficient to preempt [the Iowa EFTA]," *id.* at 13, because "[n]othing in the OCC regulations cited by U.S. Bank addresses the method national banks must use in performing EFT services for customers," *id.* at 14.

The State's argument is defeated by the plain language of the NBA and the OCC regulations at issue. The NBA authorizes national banks "[t]o exercise ... *all* ... incidental powers ... necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh) (emphasis added). OCC regulations clarify that national banks have the power to offer "to other financial institutions *any* service [the national bank] may perform for itself," including the "development, operation, management, and marketing of products and processing services for transactions conducted at electronic terminal devices." 12 C.F.R. § 7.5007(d) (emphasis added). "[T]he Supreme Court has made it clear that the Comptroller's interpretation of the NBA is entitled to great weight." *Bank One,* 190 F.3d at 849 (citing *First Nat'l Bank of E. Ark. v. Taylor,* 907 F.2d 775, 777 (8th Cir.1990) (citing *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 403–04, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987))).

Contrary to the State's view that the NBA and OCC regulations do not address the method national banks may use to provide EFT services, the NBA expressly provides that national banks may exercise *all* incidental power necessary to carry on as banks and the OCC has specified that national banks may provide to other financial institutions *any* service the bank may perform for itself, including EFT services without qualification or reservation. Thus, the broad, plain language of the NBA and OCC regulations compel the conclusion that U.S. Bank is authorized by federal law to provide CRU services. *See* 12 U.S.C. § 24 (Seventh); 12 C.F.R. § 7.5007(d); *Metrobank v. Foster,* 193 F.Supp.2d 1156, 1160 (S.D.Iowa 2002) ("Banks have always needed the ability to dispense cash and accept withdrawals as a part of their business, and these are examples of activities that are today often carried out at ATMs across the country."). Therefore, the essential question before this Court is whether the exercise of U.S. Bank's authorized power has been prevented or significantly impaired by the operation of the Iowa EFTA. 12 U.S.C. § 25b(b)(1)(B).

"In defining the pre-emptive scope of statutes and regulations granting a power to national banks, [Supreme Court precedent] take[s] the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted." *Barnett Bank,* 517 U.S. at 33, 116 S.Ct. 1103. Despite the preemptive breadth of the NBA, "States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its

---

significantly interferes with the exercise by the national bank of its powers." 12 U.S.C. § 25b(b)(1)(B). Thus, the Dodd–Frank Act

did not materially alter the standard for preemption the Court must apply in this case.

powers." *Watters,* 550 U.S. at 12, 127 S.Ct. 1559. However, "where Congress has not expressly conditioned the grant of 'power' upon a grant of state permission, the Court has ordinarily found that no such condition applies." *Barnett Bank,* 517 U.S. at 34, 116 S.Ct. 1103.

The State argues that the Iowa EFTA does not prevent or significantly impair the exercise of U.S. Bank's authorized power because the Iowa EFTA only directly regulates the conduct of state-chartered banks. U.S. Bank responds that the Court should focus on whether U.S. Bank's power to provide CRU services has been prevented or significantly impaired rather than narrowly focusing on the Iowa EFTA's enforcement arc.

■■■ The State first suggests that "Courts have refused to extend NBA preemption to allow customers of national banks to avoid application of state law." Defs.' Br. in Resistance to Pl.'s Mot. Summ. J. 8, ECF No. 29. The Court agrees with the State's general contention that state-chartered banks cannot utilize the NBA to preempt state banking laws. Indeed, the Court previously dismissed FSB's challenge to the Iowa EFTA's routing requirement's on the basis that FSB "lack[ed] its own or third-party standing to assert its claims." *Gronstal,* 598 F.Supp.2d at 967. However, FSB does not seek to utilize NBA preemption to avoid the general application of the Iowa EFTA in this case; rather, the this challenge is brought by U.S. Bank alone.

Citing *SPGGC, LLC v. Blumenthal,* 505 F.3d 183 (2d Cir.2007), the State further argues that the Court should focus on which entity's conduct is directly regulated by the Iowa EFTA. In *Blumenthal,* SPGGC, a subsidiary of shopping mall operator Simon Property Group (Simon), and Bank of America (BoA), a national bank, entered an agreement to issue Simon-themed gift cards that included monthly service fees and an expiration date under an arrangement where "BoA was the issuer of the Simon Giftcard, [and] SPGGC bore the costs of administering the program and also collected and retained maintenance and other fees associated with the cards." *Blumenthal,* 505 F.3d at 191. SPGGC sought an injunction against the enforcement of a Connecticut law that "prohibit[ed] the sale of any [gift card] subject to inactivity or dormancy fees or to an expiration date." *Id.* at 187. Although the court noted that "national banks have the authority, under federal law, to develop and market gift cards that function in generally the same way as those at issue here," it concluded that the "enforcement of the Law ... does not interfere with BoA's ability to exercise its powers under the NBA and OCC regulations," because it was SPGGC that sought to collect monthly service fees, not BoA. *Id.* at 189, 191. Thus, contrary to the State's position, although the *Blumenthal* court ultimately determined that preemption was not warranted, it remained analytically focused on the question of whether the exercise of BoA's power had been impaired by operation of state law.

In *SPGGC, LLC v. Ayotte,* 488 F.3d 525 (1st Cir.2007), the First Circuit considered a challenge to a New Hampshire law, similar to the Connecticut law at issue in *Blumenthal,* that "restrict[ed] the sale of 'gift certificates,' including stored value gift-cards issued by national banks and national thrifts, that carry expiration dates or are subject to administrative fees." *Id.* at 527. Metabank, a national thrift, and U.S. Bank contracted with SPGGC to issue Simon-themed gift cards that were subject to an expiration date and other administrative fees. *Id.* at 528. The court reasoned that under OCC regulations there was little dispute "that a national bank has the power to issue stored value cards that carry expiration dates and administrative

fees." *Id.* at 531. However, New Hampshire "argue[d] that [the] regulation [at issue did] not conflict with the National Bank Act or OCC regulations because it regulate[d] only Simon, a company that is not a bank." *Id.*

In contrast to the giftcard scheme at issue in *Blumenthal,* in *Ayotte,* it was the national bank, not SPGGC, that established and collected the disputed fees. Thus, the *Ayotte* court rejected New Hampshire's argument that the law was not an attempt to regulate national banks, reasoning that such an analysis was too formalistic since the question was "not whom the New Hampshire statute regulates, but rather, against what activity it regulates." *Id.* at 532. Considering that question, the *Ayotte* court concluded that the New Hampshire law was preempted by the NBA because a state cannot indirectly restrict a national bank's ability to exercise its power by prohibiting a third-party from engaging in some other act. *See id.* at 533 ("Even if the [New Hampshire law] does not directly prohibit US[ Bank] from engaging in such activity, it does so indirectly by prohibiting Simon from acting as US[ Bank]'s agent.").

Here, as in *Ayotte,* the Iowa EFTA does not attempt to directly regulate U.S. Bank and the State concedes that it has no power to do so in this context. However, the fact that the regulation at issue does not explicitly prohibit U.S. Bank's ability to provide CRU services in the abstract is immaterial. The Court's focus is whether the regulation at issue prevents or significantly impairs U.S. Bank's ability to exercise a federally granted power, not whether the regulation is enforceable directly against U.S. Bank. *See Watters,* 550 U.S. at 18, 127 S.Ct. 1559 ("We have never held that the preemptive reach of the [National Bank Act] extends only to a national bank itself. Rather, in analyzing whether state law hampers the federally permitted activities of a national bank, we have focused on the exercise of a national bank's *powers.*"); *Blumenthal,* 505 F.3d at 191 (recognizing that the court "must ask whether the regulation at issue actually affects the national bank's exercise of any authorized powers or whether it limits only activities of the third party which are otherwise subject to state control."); *Ayotte,* 488 F.3d at 533 (discussing New York regulations at issue in *Franklin National Bank v. New York,* 347 U.S. 373, 74 S.Ct. 550, 98 L.Ed. 767 (1954), that prohibited any banks other than New York's charter savings banks from advertising that they accepted "savings," and reasoning that "we do not believe that the regulation at issue in *Franklin National Bank* would have presented any less of a conflict with the National Bank Act if it indirectly restricted a national bank's power by prohibiting New York advertising firms from using the word 'savings' when preparing advertising for a bank, or if it had prohibited billboard owners from posting signs for banks that included the word 'savings' "); *Bank One,* 190 F.3d at 847–50 (holding provisions of the Iowa EFTA that restricted out-of-state banks from operating ATMs within Iowa were preempted by NBA even though the state of Iowa attempted to enforce provisions of the Iowa EFTA against third-party retailer).

Next, the State argues that even if the proper focus of the Court's analysis is on U.S. Bank's ability to exercise its power, the Iowa EFTA does not prevent or significantly impair U.S. Bank's ability to exercise its power because (1) U.S. Bank currently provides DPC services to five Iowa state-chartered financial institutions; (2) U.S. Bank could provide both DPC and CRU services to any nationally-chartered bank; and (3) "[t]he incremental cost of routing a transaction through SHAZAM is small, at most 8 cents per transaction. Sometimes the additional cost is as low as

two cents per transaction. In the context of typical ATM fees and surcharges consumers pay to use ATM machines, this is a minimal amount." Defs.' Br. in Resistance to Pl.'s Mot. Summ. J. 12, ECF No. 29 (citations omitted). Thus, while the State acknowledges that under Iowa's EFTA, U.S. Bank cannot provide CRU services to state-chartered banks without becoming an authorized CRU, the State apparently argues that U.S. Bank still has the capacity to provide some *other* services to a limited number of state-chartered banks.

The State's argument is not persuasive. The issue in this case is whether the Iowa EFTA prevents or significantly impairs U.S. Bank's ability to provide CRU services and not whether U.S. Bank can provide DPC services to state-chartered banks, can provide full EFT services to national banks, or has the capacity to earn some revenue by completing some transactions for state-chartered banks. Indeed, the amount of gross revenue U.S. Bank could earn if it were to provide CRU services to state-chartered banks is not relevant to the Court's analysis. *See Barnett Bank*, 517 U.S. at 30–43, 116 S.Ct. 1103 (not considering whether state regulation impacted national bank's revenue in preemption analysis); *Franklin Nat'l Bank*, 347 U.S. at 375–79, 74 S.Ct. 550 (same).

Even if the consideration of the gross revenue U.S. Bank might derive from the provision of CRU services were relevant to the Court's preemption analysis, the Court notes that the financial injury U.S. Bank incurs as a result of the Iowa EFTA is neither theoretical nor merely minimal. SHAZAM charges between two and eight cents for each transaction in which it operates as a CRU. It is undisputed that each month, U.S. Bank processes over 75,000 transactions in Iowa that must be routed through an approved CRU, in this case SHAZAM. While the State makes much of the fact that U.S. Bank already provides

DPC services to five Iowa state-chartered banks, U.S. Bank is effectively prohibited from providing CRU services to any of the 313 Iowa state-chartered banks or the 133 Iowa state-chartered credit unions. Thus, U.S. Bank is unable to offer CRU services to a significant customer base because of the potential sanctions against state-chartered banks that utilize a non-approved CRU. *See* Iowa Code § 527.3 ("An administrator may issue any order necessary to secure compliance with or prevent a violation of this chapter.... A person who violates a provision of this chapter ... is subject to a civil penalty not to exceed one thousand dollars for each day the violation continues.").

Finally, the State argues that the Iowa EFT does not prevent or significantly impair U.S. Bank's ability to exercise its powers because "U.S. Bank can comply with both [the Iowa EFTA] and the NBA simultaneously. Nothing in [the Iowa EFTA] prevents U.S. Bank from selling its products and services, as evidenced by its current relationship with FSB." Defs.' Mot. Summ. J. 5, ECF No. 26. This is beside the point. U.S. Bank's ability to retain FSB as a customer (by subsidizing FSB's CRU routing costs) is not a substitute for U.S. Bank's ability to exercise its federally-granted power to provide CRU services. Further, the Court finds that U.S. Bank's compliance with the CRU approval requirements of the Iowa EFTA, Iowa Code § 527.9, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wis. Pub. Intervenor*, 501 U.S. at 605, 111 S.Ct. 2476 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). However, even if the approval provisions of the Iowa EFTA did not stand as an obstacle to U.S. Bank's ability to exercise its power, a conflict exists between the federal and the state law because U.S. Bank cannot comply with both federal law and Iowa Code § 527.9.

In order for U.S. Bank to become an approved CRU, it must allow Iowa EFTA administrators to appoint at least four members of the board that sets policy for the CRU, see Iowa Code § 527.9(5)(a), and those board members must "represent the interest of consumers and the business and agricultural communities in establishing policies for the [CRU]," *id.* § 527.9(5)(c). In direct conflict with the Iowa EFTA, the NBA requires that shareholders elect a national bank association's directors, 12 U.S.C. § 71, and that each director "shall take an oath that he will . . . diligently and honestly administer the affairs of [the national bank association's governing body]," 12 U.S.C. § 73. Further, the Iowa EFTA requires that the CRU "operating under the approval of the administrator shall be subject to examination by the administrator for the purpose of determining compliance with this chapter." Iowa Code § 527.9(4). However, "[n]o national bank shall be subject to any visitorial powers except as authorized by Federal law." 12 U.S.C. § 484(a); *cf. Watters,* 550 U.S. at 14–15, 127 S.Ct. 1559 ("Visitation, . . . is the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting business, and enforce an observance of its laws and regulations . . . . [the state], therefore, cannot confer on its commissioner examination and enforcement authority over mortgage lending, or any other banking business done by national banks.") (internal quotation marks and citation omitted); *First Nat'l Bank,* 907 F.2d at 777 n. 6 (noting that compliance with state regulations such as "payment of licensing fees, financial information disclosure, and inspection by the Commissioner . . . . would pervert [a national bank]'s status as a federal instrumentality"). Thus, the Iowa EFTA's CRU certification requirements and federal law are in direct conflict, and compliance with both is an impossibility.

In sum, the Court finds that the proper inquiry is to determine the degree to which U.S. Bank's ability to exercise its federally-granted powers has been impaired by the Iowa EFTA, not whether the Iowa EFTA directly regulates only state-chartered banks. *See Watters,* 550 U.S. at 12, 127 S.Ct. 1559. It is undisputed that while U.S. Bank can provide DPC services to state-chartered banks, U.S. Bank cannot exercise its power to provide CRU services to state-chartered banks because state-chartered banks are prohibited from utilizing U.S. Bank to provide CRU services unless U.S. Bank becomes an authorized CRU. However, U.S. Bank need not comply with Iowa Code § 527.9 both because it stands as an obstacle to U.S. Bank's ability to provide CRU services, and because the certification provisions of the Iowa EFTA are in direct conflict with federal law. Thus, although "States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's . . . exercise of its powers," *id.,* in this instance, the State has entirely prevented U.S. Bank from providing CRU services to state-chartered banks. Therefore, the Court concludes that the provisions in the Iowa EFTA that prevent or significantly interfere with U.S. Bank's ability to provide CRU services are preempted by federal law. *See id.* ("[W]hen state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way."); *see also Bank One,* 190 F.3d at 850 ("Congress has made clear in the NBA its intent that ATMs [administered by national banks] are not to be subject to state regulation, and thus the provisions of the Iowa EFTA that would prevent or significantly interfere with Bank One's placement and operation of its ATMs must be held to be preempted."); *Metrobank,* 193 F.Supp.2d at 1161–62 ("The governing in-

terpretation of the law is that the EFTA is not the relevant legislation, and under the governing statute, the NBA, ATMs are not to be subject to state regulation. This district court is bound to follow that decision." (internal quotation marks and citation omitted)).

### D. Permanent Injunction

 U.S. Bank asks the Court to permanently enjoy the State from enforcing Iowa Code §§ 527.5 and 527.9. "The standard for issuing a preliminary or permanent injunction is essentially the same, excepting one key difference. A permanent injunction requires the moving party to show actual success on the merits, rather than the fair chance of prevailing on the merits required for a standard preliminary injunction." *Oglala Sioux Tribe v. C & W Enters., Inc.*, 542 F.3d 224, 229 (8th Cir. 2008). "If a court finds actual success on the merits, it then considers the following factors in deciding whether to grant a permanent injunction: (1) the threat of irreparable harm to the moving party; (2) the balance of harms with any injury an injunction might inflict on other parties; and (3) the public interest." *Id.*; *see also Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (en banc). Having already found that U.S. Bank succeeded on the merits, if U.S. Bank would suffer irreparable harm but for entry of a permanent injunction, then "the balance-of-harm and public-interest factors need not be taken into account." *Bank One*, 190 F.3d at 847.

U.S. Bank argues that "U.S. Bank has suffered, and will continue to suffer, economic loss from the provisions of the [Iowa] EFTA that exclude it from processing not-us transactions." Pl.'s Br. in Supp. of Pl.'s Mot. Summ. J. 17, ECF No. 25–1. The Court must agree. As established

*supra*, U.S. Bank incurs significant charges in reimbursing FSB fees paid to SHAZAM to act as the CRU for some of FSB's transactions. Also, the Iowa EFTA effectively precludes U.S. Bank from offering CRU services to a substantial client base. Thus, "[f]ollowing the dictates of the Eighth Circuit Court of Appeals, this Court finds [U.S. Bank] ha[s] established irreparable harm through [its] economic loss by not being able to charge" FSB and other state-chartered banks for CRU services and through having to reimburse FSB for the fees it pays SHAZAM. *Metrobank*, 193 F.Supp.2d at 1162; *see also Bank One*, 190 F.3d at 850–51 (concluding that Bank One had established irreparable harm where "in the absence of an injunction the continued enforcement of the relevant provisions of the Iowa EFT would result in irreparable economic loss to Bank One").

Having determined that the relevant provisions of the Iowa EFTA are preempted by the NBA and that U.S. Bank would suffer irreparable harm in the absence of an injunction, U.S. Bank is "entitled to injunctive relief no matter what the harm to the State, and the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Bank One*, 190 F.3d at 847–48.

### III. CONCLUSION

For the aforementioned reasons, U.S. Bank's Motion for Summary Judgment (ECF No. 25) must be **granted,** and the State's Cross Motion for Summary Judgment (ECF No. 26) must be **denied.** The Court declares that Defendants, and any persons acting on Defendants' instructions, may not, consistent with the United States Constitution, the National Bank Act, and implementing regulations, enforce sections 527.5 and 527.9 [2] against U.S. Bank and/or

---

**2.** At the close of the hearing on the pending motions, counsel for the State requested in

any entity to which U.S. Bank provides the correspondent, data processing, and electronic services described herein. The Defendants, and any persons acting on their instructions, requests, or in concert with them, are hereby permanently enjoined from enforcing any and all provisions of the Iowa Electronic Transmission of Funds Act, specifically §§ 527.5 and 527.9, against U.S. Bank and/or any entity to which U.S. Bank provides the correspondent services, that purport to restrict the transmission of any satellite terminal transaction to U.S. Bank by requiring that it be transmitted to a state-approved central routing unit. The Clerk of Court shall enter judgment reflecting such an injunction.

**IT IS SO ORDERED.**

the alternative that, should the Court find some conflict with federal law, the Court only invalidate those portions of the statute in direct conflict (board member and visitation rights), but that the Court leave in place the connectivity requirement in § 527.9. U.S. Bank responded that due to the threat of an enforcement action they would not be able to do business with potential customers unless § 527.9 is likewise invalidated. This issue was not briefed by the parties. Yet consistent with the discussion in this Order and the effect of § 527.9 on the ability of U.S. Bank to function in relevant ways, the Court discerns no rational separation between § 527.5 and § 527.9.