**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SOUTHERN BLASTING SERVICES,
INCORPORATED; PIEDMONT DRILLING &
BLASTING, INCORPORATED,
   *Plaintiffs-Appellants,*

v.

WILKES COUNTY, NORTH CAROLINA, a
body politic; KEVIN D. BOUNDS,
Wilkes County Fire Marshal,
   *Defendants-Appellees.*

No. 01-2098

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Richard L. Voorhees, District Judge.
(CA-98-102-5-V)

Argued: February 27, 2002

Decided: April 29, 2002

Before WILKINSON, Chief Judge, and WILLIAMS
and GREGORY, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Williams and Judge Gregory joined.

_____

### COUNSEL

**ARGUED:** Douglas George Eisele, EISELE, ASHBURN, GREENE
& CHAPMAN, P.A., Statesville, North Carolina, for Appellants.

Anthony Ray Triplett, VANNOY, COLVARD, TRIPLETT & VAN-NOY, P.L.L.C., North Wilkesboro, North Carolina, for Appellees.

## OPINION

WILKINSON, Chief Judge:

Plaintiffs Southern Blasting Services, Inc. and Piedmont Drilling & Blasting, Inc. seek to conduct explosives businesses and blasting operations in Wilkes County, North Carolina using Hazardous Materials Transportation Act ("HMTA") Class 1 materials. Plaintiffs challenge two County ordinances, one which requires permitting of explosives operations and one which regulates the storage and use of explosives in the County. Plaintiffs claim that the ordinances are preempted by federal law, are invalid under North Carolina law, and violate their due process rights. The district court upheld the validity of both ordinances, granting summary judgment for Wilkes County and the County Fire Marshal. We affirm.

I.

During the summer of 1997, plaintiffs Southern Blasting Services, Inc. and Piedmont Drilling & Blasting, Inc. set up operations in Wilkes County, North Carolina. Southern Blasting purchases HMTA Class 1 explosives and has them hauled to its magazine site in Wilkes County, where they are stored until sold to industrial customers. Southern Blasting has also expressed an interest in manufacturing explosives at its site, but it has not yet done so. Piedmont Drilling conducts blasting operations by drilling holes in rock formations, loading the holes with explosives, and detonating the explosives to loosen or remove the rock.

Shortly after plaintiffs established their explosives businesses in the County, citizens began to voice objections to their operations. On September 16, 1997, approximately 150 County residents attended the meeting of the Wilkes County Board of Commissioners to express their views. And the Board was presented with a petition containing 878 signatures opposing explosives operations in the County. Due to

safety concerns and this public outcry, the Board voted unanimously to have a committee draft ordinances that would establish both a permit system and a comprehensive set of regulations for the operation of explosives businesses.

On June 16, 1998, after several months of work by the appointed committee, the Board unanimously adopted the Wilkes County Explosive Materials Permitting Ordinance. The Permitting Ordinance required applicants to obtain a permit from the County Fire Marshal prior to possessing, storing, selling, transporting, or otherwise dealing in explosive materials in Wilkes County. In addition, the Permitting Ordinance provided that only businesses operating in the County on the day the ordinance was adopted could apply for a permit. And the ordinance gave ultimate decision-making authority to the Fire Marshal. *See* Permitting Ordinance art. VI. However, the application process included a public hearing and consultation with the Federal Bureau of Alcohol, Tobacco & Firearms ("BATF"), the County Planning Department, the County Health Department, the County Building Inspections Department, and the Board. *See* Permitting Ordinance art. VI(E). Further, the Permitting Ordinance specifically excluded ammunition or firearms dealers licensed under federal or state law from its requirements. *See* Permitting Ordinance art. V, VI(A).

On August 4, 1998, the Board also unanimously enacted the Wilkes County Explosive Materials Ordinance (the "Regulatory Ordinance"), which became effective on December 8, 1998 after the necessary approval was obtained from the North Carolina Building Code Council. This ordinance addressed the storage and use of explosives in the County. Specifically, the Regulatory Ordinance restricted the manufacture of explosives, required installation of security measures at storage locations, set limits on the quantity of stored explosives, and established penalties for violations. *See* Regulatory Ordinance art. VI, VII. Like the Permitting Ordinance, the Regulatory Ordinance excluded the possession, transportation, storage, and use of small arms ammunition from its scope. *See* Regulatory Ordinance art. V.[1]

_____

[1]While the Building Code Council approval of the Regulatory Ordinance was pending, the County Fire Marshal issued a directive limiting the hours of operation for vehicles transporting explosive materials on

Plaintiffs did not apply for a permit under the Permitting Ordinance. Instead, plaintiffs initiated this action, alleging that the Permitting and Regulatory Ordinances were preempted by federal law, were invalid under North Carolina law, and violated their due process rights. Plaintiffs sought injunctive relief to prevent the enforcement of the ordinances. The district court concluded that both the Permitting and Regulatory Ordinances were valid and granted summary judgment to the County and the Fire Marshal. *See S. Blasting Servs., Inc. v. Wilkes County*, 162 F. Supp. 2d 455 (W.D.N.C. 2001).

The district court held that plaintiffs' preemption claim failed because Congress did not intend to "occupy the field" of explosives regulation and plaintiffs had failed to show a "direct and positive conflict" between the ordinances and any federal law. *Id.* at 462-63. The court also concluded that the ordinances and their enabling statute, N.C. Gen. Stat. § 153A-128, were valid under Article II, § 24 of the North Carolina Constitution, which prevents the North Carolina General Assembly from promulgating certain acts of less than statewide application. The court found that § 153A-128 granted authority to regulate explosive substances uniformly to all North Carolina counties in conformance with Article II, § 24. *Id.* at 458-59.

The district court next rejected plaintiffs' substantive due process claim, finding that the ordinances were a valid exercise of the County's police power and were rationally related to a legitimate governmental purpose. *Id.* at 459-60. Finally, because plaintiffs had not even applied for a permit, the district court concluded that they lacked standing to assert a procedural due process challenge to the ordinances. *Id.* at 460-61. Plaintiffs appeal.

---

two County roads. The directive was based on the Fire Marshal's concern for traffic on these roads during school-bus hours and the proximity of plaintiffs' businesses to an elementary school. The district court found that the directive was preempted by the HMTA and was therefore void and unenforceable. *S. Blasting Servs., Inc. v. Wilkes County*, 162 F. Supp. 2d 455, 463-65 (W.D.N.C. 2001). The County has not appealed the validity of the directive, so we need not address this issue.

## II.

### A.

We begin by considering plaintiffs' preemption claim. It is well-established that the Supremacy Clause "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 9 Wheat. 1, 211 (1824)). The Supreme Court has repeatedly held that "state laws can be pre-empted by federal regulations as well as by federal statutes" and that "for the purposes of the Supremacy Clause, the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough*, 471 U.S. at 713 (citing cases).

Yet "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). This presumption is strongest when Congress legislates "in a field which the States have traditionally occupied." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation omitted). States have long possessed primary responsibility in our federal system for protecting the health and safety of their citizens. *Id.* at 475, 485. Indeed, courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Nevertheless, there are several ways in which federal law may supersede state or local law. First, Congress may expressly preempt such laws. *See, e.g.*, *Hillsborough*, 471 U.S. at 713. Second, in the absence of express preemptive language, Congress' intent to preempt state law may be implied when "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) (internal quotations omitted). Finally, preemption will also be implied if state or local law "actually conflicts with federal law." Such a conflict occurs "when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and exe-

cution of the full purposes and objectives of Congress." *Hillsborough*, 471 U.S. at 713 (internal quotations omitted).

### B.

Plaintiffs claim that federal law regulating the manufacture, distribution, and storage of explosive materials preempts the County's Permitting and Regulatory Ordinances. They maintain that the County ordinances are superseded because of the exhaustive nature of federal law in the explosives field, and because various provisions of the ordinances are in direct and positive conflict with federal regulations.

The federal law governing explosive materials is codified at 18 U.S.C. §§ 841-848 (2000). Section 848, entitled "Effect on State law," provides:

> No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together.

This statutory language makes clear that Congress did not intend to occupy the field of licensing and regulating explosives operations. In preemption analysis, "[t]he purpose of Congress is the ultimate touchstone." *Retail Clerks Int'l Ass'n, Local 1625 v. Schermerhorn*, 375 U.S. 96, 103 (1963). Here Congress has stated in the clearest of terms that it was not preempting local efforts to regulate the explosives industry, absent a direct and positive conflict with the federal standards. In fact, as the district court recognized, "§ 848 is designed to limit the preemptive scope" of the federal law and expressly "disclaims any intent to occupy the field." *S. Blasting*, 162 F. Supp. 2d at 462.[2]

---

[2]Plaintiffs' contention that the County ordinances are invalid because § 848 only refers to "state" laws is without merit. As the district court concluded, there is "no reason to believe Congress intended to treat local and State regulations differently" under § 848. *S. Blasting*, 162 F. Supp. 2d at 462. And for preemption purposes, "the constitutionality of local ordinances is analyzed in the same way as that of statewide laws." *Hillsborough*, 471 U.S. at 713.

Contrary to plaintiffs' assertions, the comprehensiveness of federal law in the explosives area does not override this clear expression of congressional intent in § 848. The Supreme Court has noted that contemporary issues often require "intricate and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem." *Hillsborough*, 471 U.S. at 717 (internal quotation omitted). This is especially true in a case such as this one where Wilkes County acted pursuant to its traditional police powers. Indeed, the Court "will seldom infer, solely from the comprehensiveness of federal regulations, an intent to preempt in its entirety a field related to health and safety." *Id.* at 718.

Congress' desire not to preempt state and local efforts to regulate explosive materials is unsurprising given the fact that conditions in states and localities vary greatly. For example, local governments may determine that the use or storage of explosives is particularly dangerous due to population density or the proximity of explosives to schools, nursing homes, or residential areas. Congress did not intend to preempt democratic responses to such local conditions and concerns. Instead, by allowing state and federal regulations to coexist, Congress was fostering the values of federalism and recognizing the "historic primacy of state regulation of matters of health and safety." *Medtronic*, 518 U.S. at 485. Plaintiffs on the other hand, ask this court to cut the democratic process short by declaring the County ordinances void and unenforceable.

We are similarly unpersuaded by plaintiffs' argument that the County ordinances are invalid because they are in "direct and positive conflict" with the federal law governing explosive materials. The "direct and positive conflict" language in 18 U.S.C. § 848 simply restates the principle that state law is superseded in cases of an actual conflict with federal law such that "compliance with both federal and state regulations is a physical impossibility." *Hillsborough*, 471 U.S. at 713 (internal quotation omitted). Indeed, § 848 explains that in order for a direct and positive conflict to exist, the state and federal laws must be such that they "cannot be reconciled or consistently stand together." 18 U.S.C. § 848.

To support their argument that a direct conflict is present in this case, plaintiffs point to numerous provisions of the County Permitting

and Regulatory Ordinances that impose more stringent requirements than those contained in the federal regulations. For example, unlike the federal regulations, the Permitting Ordinance requires a permit applicant to submit a detailed history of all past and present operations, detailed written information on the applicant's financial ability, and an estimated schedule of all activities and operations the applicant plans to conduct. *See* Permitting Ordinance art. VI(C).

However, a state or locality's imposition of additional requirements above a federal minimum is unlikely to create a direct and positive conflict with federal law. Rather, a conflict is more likely to occur when a state or locality provides that compliance with a federal standard is not mandated, or when compliance with federal law actually results in a violation of local law. Here, even though the County ordinances are strict, they do not create a situation where the ordinances and the federal law cannot be reconciled or consistently stand together.

The BATF, which is authorized to issue regulations to administer the federal explosives laws, has stated that a federal license to import, manufacture, or deal in explosive materials does not exempt a licensee from state and local requirements. Indeed, a federal license "confers no right or privilege to conduct business or operations, including storage, contrary to State or other law." 27 C.F.R. § 55.62 (2001). And a federal licensee "is not . . . immune from punishment for conducting an explosive materials business or operations in violation of the provisions of any State or other law." *Id.* Further, BATF has explained that "[w]here a situation arises that State or local requirements are more stringent than the Federal, the more stringent requirement must be followed." *ATF — Explosives Law and Regulations*, ATF P 5400.7 at 57 (June 1990).

Moreover, BATF actually examined the County's Permitting and Regulatory Ordinances and stated in a letter that "while the ordinances contain some provisions which are more stringent than those contained in [18 U.S.C. §§ 841-848], it does not appear that compliance with the Wilkes County Ordinances would result in a violation of [§§ 841-848]." To the contrary, compliance with the more stringent requirements of the County ordinances actually helps to assure compliance with the federal requirements.

We also reject plaintiffs' argument that the ordinances cannot be reconciled with federal law because the Regulatory Ordinance prevents licensed companies from expanding, and because the Permitting Ordinance prevents new companies from establishing explosives operations in the County. *See* Regulatory Ordinance art. VI(C)(7); Permitting Ordinance art. VI(J). Nothing in the federal explosives statute or regulations prevents localities from regulating or even limiting the number of explosives operations in their midst. The fact that federal law regulates the operations of explosives companies does not imply that Congress intended to stop a locality from going further to reduce their risks. This is especially true in light of the strong anti-preemption language in § 848 explaining that no provision of the federal explosives law "shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter."

III.

We next turn to plaintiffs' claim that the County ordinances and their enabling statute are invalid under the North Carolina Constitution. The Permitting and Regulatory Ordinances were enacted pursuant to N.C. Gen. Stat. § 153A-128 (1999), which states that "[a] county may by ordinance regulate, restrict, or prohibit the sale, possession, storage, use or conveyance of any explosive, corrosive, inflammable, or radioactive substance." Plaintiffs contend that both § 153A-128 and the County ordinances are invalid under Article II, § 24 of the North Carolina Constitution because they affect trade or business but do not have statewide application.

We note at the outset that a federal court should be exceedingly cautious about invalidating a state statute or a local ordinance under a state constitution. Like most states, North Carolina "recognizes a presumption in favor of the constitutionality of a [state] statue." *Gardner v. City of Reidsville*, 153 S.E.2d 139, 150 (N.C. 1967). In order for an act of the General Assembly to be declared unconstitutional under the North Carolina Constitution, "it must be plainly and clearly the case. If there is any reasonable doubt, it will be resolved in favor of the lawful exercise of [the General Assembly's] powers." *E.g.,*

*Town of Emerald Isle v. State*, 360 S.E.2d 756, 761 (N.C. 1987) (internal quotation omitted).

Article II, § 24 of the North Carolina Constitution prohibits the General Assembly from promulgating local acts relating to various specified topics. Article II, § 24 states:

> (1)   *Prohibited subjects*. The General Assembly shall not enact any local, private, or special act or resolution:
>
> > (a)   Relating to health, sanitation, and the abatement of nuisances; . . .
> >
> > (j)   Regulating labor, trade, mining, or manufacturing; . . .
>
> (4)   *General laws*. The General Assembly may enact general laws regulating the matters set out in this Section.

The North Carolina Supreme Court has defined a local act as a law "applying to fewer than all counties, in which the affected counties do not rationally differ from the excepted counties in relation to the purpose of the act." *Smith v. County of Mecklenburg*, 187 S.E.2d 67, 73 (N.C. 1972).

We agree with the district court that "§ 153A-128 is a general law that comports perfectly with Article II, § 24." *S. Blasting*, 162 F. Supp. 2d at 459. Section 153A-128 does not apply to fewer than all the counties in North Carolina. Instead, it uniformly confers authority on all 100 North Carolina counties to regulate or prohibit explosive materials. Therefore, § 153A-128 is valid under the North Carolina Constitution.

Furthermore, the Wilkes County Permitting and Regulatory Ordinances do not violate the North Carolina Constitution. As the district court noted, "Article II, § 24 does not mention or address the regulatory authority of counties or other local governments." *Id.* And Article II, § 24 in no way prohibits the General Assembly from empowering counties to act in the specified fields. In fact, the primary purposes of

Article II, § 24 were to "free the General Assembly" from the "petty detail" of enacting local legislation, to enable the General Assembly "to devote more time and attention to general legislation of statewide interest and concern," and thereby to "strengthen local self-government" by delegating local matters to local authorities. *High Point Surplus Co. v. Pleasants*, 142 S.E.2d 697, 702 (N.C. 1965).[3] Article II, § 24 was meant to promote just the type of interaction that has occurred here between the General Assembly and a local government, which is concededly more familiar with local conditions.

IV.

Finally, we address plaintiffs' due process claim. Plaintiffs contend that the County violated their due process rights by granting the County Fire Marshal broad discretionary authority under the ordinances, especially the Permitting Ordinance. It is not entirely clear, however, whether plaintiffs are presenting this argument as a substantive or procedural due process challenge. Therefore, like the district court, we consider each in turn and conclude that plaintiffs' claim fails under both.

A.

In order to state a substantive due process claim, plaintiffs must demonstrate: "(1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 827 (4th Cir. 1995). Substantive due process protections "run only to state action so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any

---

[3]*High Point* discussed former Article II, § 29 of the North Carolina Constitution. However, the North Carolina Supreme Court has stated that decisions "which refer directly to former Article II, § 29, apply equally to present Article II, § 24," which is identical in all material respects. *Smith*, 187 S.E.2d at 73.

post deprivation state remedies." *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991).

Even if plaintiffs could prove that they had a property interest and that the County somehow deprived them of that interest by making it more difficult to operate an explosives business, plaintiffs' substantive due process claim fails under the third prong of the *Sylvia* test. The County's actions obviously did not fall beyond the outer limits of legitimate governmental action. Instead, the County's actions were rationally related to a legitimate governmental purpose. Therefore, plaintiffs "cannot demonstrate that the County's actions were arbitrary or irrational as required by *Sylvia* and *Rucker*." *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 440 (4th Cir. 2002).

First, we need look no further than the text of the Permitting and Regulatory Ordinances to discover the County's legitimate governmental interest. The County's purpose in enacting the ordinances was "protecting the public and safeguarding the health and welfare of the citizens of the County." Permitting Ordinance art. III; Regulatory Ordinance art. III. The Board found "that the location, possession, storage, use, handling, manufacture, sale, and transportation of certain explosive materials, together with the danger of fire, injury, and theft in connection therewith, constitute[d] a potential hazard to the health, safety, and welfare of the citizens of the County unless carefully regulated, controlled, and monitored." Permitting Ordinance art. III; Regulatory Ordinance art. III. As the district court noted, "[p]laintiffs' suggestion that their explosives operations pose no threat to the public is absurd" — plaintiffs deal with HMTA Class 1 explosive materials. *S. Blasting*, 162 F. Supp. 2d at 460. We agree with that court that "it would be a truly strange decision for a court to find that blasting operations and the storage of inherently hazardous materials do not present matters of legitimate concern." *Id.* Protecting the "health, safety, and well-being of the County's citizens are basic governmental functions. And this court will not substitute its policy judgments as to the exercise of the police power for those of a democratically elected local government." *Tri-County*, 281 F.3d at 439.

Second, the Permitting and Regulatory Ordinances are rationally related to the aforementioned goals of minimizing the risks of theft, fire, and explosion associated with blasting operations. The ordi-

nances "tighten security at explosives storage facilities, limit the pre-mixing and storage of volatile materials, and require information on the size, location, and duration of any blasting operations." *S. Blasting*, 162 F. Supp. 2d at 460. Further, the County could reasonably have believed that the Fire Marshal, given his experience with the hazards of fires and explosions, was in the best position to decide whether to grant a permit under the Permitting Ordinance, and was in the best position to enforce the Regulatory Ordinance. Therefore, the County's grant of authority to the Fire Marshal to review permit applications and implement the ordinances was also rationally related to the County's legitimate interest in protecting the health and safety of its residents.

B.

Plaintiffs' complaint regarding the Fire Marshal's discretionary powers under the ordinances also fails as a procedural due process claim. First, plaintiffs lack standing to bring such a challenge. In order to have standing, plaintiffs must show that: (1) they have suffered an injury in fact; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that the injury is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). And in order to satisfy the injury-in-fact requirement, plaintiffs must demonstrate that they "suffer[ed] an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (en banc) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Here, plaintiffs have never even applied for a permit, much less been denied one. Therefore, they cannot demonstrate an actual injury from the County granting the Fire Marshal decision-making authority under the Permitting Ordinance. *See Oriental Health Spa v. City of Fort Wayne*, 864 F.2d 486, 488-89 (7th Cir. 1988) (finding that a plaintiff lacked standing to bring a procedural due process challenge to a local licensing scheme where plaintiff had never been threatened with revocation or suspension of its current license).

Second, even if plaintiffs had standing, their procedural due process claim fails because the Permitting Ordinance does not grant

unfettered discretion to the Fire Marshal. Instead, the ordinance provides ample process by establishing a set of procedures to ensure that permits cannot be denied or revoked randomly. For example, a permit applicant must submit a large volume of information, which is designed to assist the Fire Marshal in determining whether or not the proposed operation "will be conducted in a safe and responsible manner" in accordance with federal and state law and County ordinances. *See* Permitting Ordinance art. VI(C). Further, before a permit can be granted or denied, the Fire Marshal must consult with the BATF, the County Planning Department, the County Health Department, the County Building Inspections Department, and the County Board of Commissioners. *See* Permitting Ordinance art. VI(B), (E). In addition, there must be time set aside at a regularly scheduled Board meeting "for the purpose of hearing public comment, if any, on the operations and activities which the applicant proposes to conduct." Permitting Ordinance art. VI(E). Moreover, if the Fire Marshal ultimately determines that a permit must be denied, he must provide the applicant with a written explanation of the reasons for his decision. *Id.* And a permit applicant "may appeal [a] denial or revocation to the [North Carolina] District or Superior Courts" where an arbitrary or capricious decision by the Fire Marshal could be reversed. Permitting Ordinance art. VI(K). This procedure is quite sufficient to satisfy the requirements of procedural due process.

## V.

In sum, we find no impediment in federal or state law to Wilkes County's regulation of explosives operations. For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*