Mark C. CLINE, Plaintiff,

v.

BANK OF AMERICA, N.A., Defendant.

Civil Action No. 2:10–1295.

United States District Court,
S.D. West Virginia,
at Charleston.

Oct. 13, 2011.

Wesley Harrison White, Attorney at Law, Gilbert, WV, for Plaintiff.

Carrie Goodwin Fenwick, Deanna R. Stone, Victoria L. Wilson, Goodwin & Goodwin, Charleston, WV, for Defendant.

## MEMORANDUM OPINION AND ORDER

JOHN T. COPENHAVER, JR., District Judge.

Pending is the motion of Bank of America, N.A. ("BOA"), for judgment on the pleadings filed April 4, 2011.

### I.

#### A.  The Complaint and Removal

Plaintiff Mark C. Cline is a West Virginia citizen. Defendant BOA is a North Carolina citizen and a national bank engaged in the business of consumer lending.

Cline's complaint offers very few factual allegations. It appears that he is self employed as a chiropractor. At some unstated time he financed the purchase of a motorcycle through BOA. BOA engaged in loan collection activities following his default. It made over 400 telephone calls to Cline and his business during an unspecified interval.

Cline complains about several abusive practices related to the collection calls. Some of the contacts are alleged to have occurred after he told the caller that he had retained counsel relating to the loan obligation. Other calls were placed to Cline's employees, who then learned the details of his indebtedness.

On September 15, 2010, Cline instituted an action in the Circuit Court of Mingo County. He alleges claims for (1) violation of The West Virginia Consumer Credit and Protection Act ("WVCCPA"), West Virginia Code sections 46A–2–125(d), 46A–2–126(a), and 46A–2–128(e)[1] ("Count One"),

---

1. Section 46A–2–125(d) proscribes a debt collection method "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously, or at unusual times or at times known to be inconvenient, with intent to annoy, abuse, oppress or threaten any person at the called number." *Id.* Section 46A–2–126(a) is designed to prevent "[t]he communication to any employer or his agent before judgment has been rendered of any information relating to an employee's indebtedness other than through proper legal action, process or proceeding." *Id.* Section 46A–2–128(e) prohibits "communication with a consumer whenever it appears that the consumer is represented by an attorney and the attorney's name and address are known, or could be easily ascertained,

(2) negligence arising out of "making numerous telephone calls with the intent to annoy, harass, and oppress the Plaintiff in an effort to collect a debt...." (Compl. ¶ 10) ("Count Two"); (3) intentional infliction of emotional distress arising out of "annoying, inconveniencing, harassing, and oppressing the Plaintiff even after the Plaintiff informed the Defendant [he] ... was represented by an attorney" (*Id.* ¶ 16) ("Count Three"); (4) invasion of privacy due to interference with the right "to be free from harassing, oppressing and annoying telephone calls ..." (*Id.* ¶ 21) ("Count Four"); and (5) nuisance inasmuch as BOA caused Cline's telephone "to repeatedly or continuously ... ring several times a day for many days even after" a request to desist and contact his lawyer (*Id.* ¶ 26) ("Count Five"). Cline seeks injunctive relief, tort damages, statutory damages and interest, expunction of the underlying loan obligation and recovery of any amounts previously paid to reduce it, punitive damages, and fees and costs.

On November 12, 2010, BOA removed. It now seeks judgment on the pleadings. It asserts Cline's claims are preempted by the National Bank Act ("NBA") and, if not, that portions of Counts One through Six fail as a matter of law.

B. The Parties' Contentions Respecting NBA Preemption–Prior to the Dodd–Frank Wall Street Reform and Consumer Protection Act ("Dodd–Frank Act")

BOA relies generally upon the notion that, under the NBA, "federal control shields national banking from unduly burdensome and duplicative state regulation." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007). The decision in *Watters* provides

unless the attorney fails to answer correspondence, return phone calls or discuss the obli-

the general parameters governing day-to-day agency implementation of the NBA:

National banks' business activities are controlled by the [NBA and] ... regulations promulgated thereunder by the Office of the Comptroller of the Currency (OCC). OCC is charged with supervision of the NBA and, thus, oversees the banks' operations and interactions with customers. The NBA grants OCC, as part of its supervisory authority, visitorial powers to audit the banks' books and records, largely to the exclusion of other state or federal entities.

*Watters*, 550 U.S. at 1, 127 S.Ct. 1559 (citations omitted).

Central to its claim that Counts One through Five must give way to federal law is a regulatory provision promulgated by the Office of the Comptroller of the Currency ("OCC"), namely, 12 C.F.R. section 7.4008(d)(1). At the time this action was filed on November 12, 2010, section 7.4008(d)(1) provided pertinently as follows:

Applicability of state law.

Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized non-real estate lending powers are not applicable to national banks.

*Id.* Subsection (e) additionally states this:

State laws on the following subjects are not inconsistent with the non-real estate lending powers of national banks and apply to national banks to the extent that *they only incidentally affect* the exercise of national banks' non-real estate lending powers:

(1) Contracts;

(2) Torts;

gation in question or unless the attorney consents to direct communication." *Id.*

(3) Criminal law; ...

(4) Rights to collect debts;

(5) Acquisition and transfer of property;

(6) Taxation;

(7) Zoning; and

(8) Any other law the effect of which the OCC determines to be incidental to the non-real estate lending operations of national banks or otherwise consistent with the powers set out in paragraph (a) of this section.

12 C.F.R. § 7.4008(e) (emphasis added) (footnote omitted).

The parties in their briefing, which concluded May 4, 2011, suggest that there are two divergent lines of authority (1) interpreting these regulations, and (2) addressing their preemptive scope. BOA principally relies upon *Lomax v. Bank of America, N.A.,* 435 B.R. 362 (N.D.W.Va. 2010), and *In re Jones,* 449 B.R. 494 (Bankr.N.D.W.Va.2011) (applying *Lomax*). The precedential weight of those cases, however, appears to have been supplanted by a decision rendered in recent days. *O'Neal v. Capital One Auto Finance, Inc.,* No. 3:10–0040, 2011 WL 4549148, at *7 (N.D.W.Va. Sept. 29, 2011) (concluding, in contrast to *Lomax,* "that section 128(e) of the WVCCPA does not prevent or significantly interfere with [a national bank's] exercise of its powers under the NBA.").

Cline relies upon *Smith v. BAC Home Loans Servicing, LP,* 769 F.Supp.2d 1033 (S.D.W.Va.2011) (Goodwin, C.J.), a decision which was implicitly found persuasive in *O'Neal.* In *Smith,* the court interpreted 12 C.F.R. § 34.4(a), which governs real estate lending. Like its non-real-estate-lending counterpart found in section 7.4008(d)(1) and applicable here, section 34.4(a) provided, at the time *Smith* was decided, that "state laws ... obstruct[ing], impair[ing], or condition[ing] a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks." 12 C.F.R. § 34.4(a).

In *Smith,* the court noted that "[j]udicial opinions considering NBA and OCC preemption often borrow from the ... [Office of Thrift Supervision's ("OTS")] preemption regulation because it is similar in many respects to the OCC's regulation." *Smith,* 769 F.Supp.2d at 1043 (citing as an example, *inter alia, Lomax,* 435 B.R. at 369–70). The court explained its decision to take a different approach:

I do not find it appropriate to import wholesale the ... [Home Owners Loan Act of 1933 ("HOLA")] and OTS analysis into the context of NBA and OCC preemption. Significantly, the OTS's preemption regulation and many of the authorities construing that regulation and HOLA preemption arose before the Supreme Court clarified in *Wyeth* [*v. Levine,* 555 U.S. 555, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009)] the level of deference to be applied to agency views on preemption. *See, e.g., Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153–54, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (describing the preemptive effect of federal regulations). It appears to me that Justice Blackmun's analysis in *de la Cuesta* of the standard of review to be applied to preemptive agency regulations is in direct conflict with the majority opinion in *Wyeth.*

*Smith,* 769 F.Supp.2d at 1043–44 (some citations omitted) ("I conclude that the WVCCPA provisions implicated by Counts II [(alleging false and misleading representations in violation of W. Va.Code section 46A–2–127)] and III [(alleging unconscionable debt collection methods in violation of W. Va.Code section 46A–2–128)] are not an obstacle to the policies and purposes underlying the federal regulation of national banks.").

The court in *Smith* also noted that the NBA lacked an express preemption provision. For that reason, the court confined its analysis to conflict preemption principles, concluding, *inter alia,* as follows:

I look to the intent of Congress, as best demonstrated by the text of the NBA, and conclude that there is no significant federal regulatory objective at play that would merit displacing the generally applicable state consumer-protection claims presented in the Complaint. It is apparent that even if BAC must comply with West Virginia's statutory prohibitions on misrepresentations and unconscionable conduct in the field of debt collection (as every debt collector doing business in West Virginia must also do), BAC will remain free to engage in the federally regulated and sanctioned business of mortgage servicing. Obstacle preemption is not triggered merely because West Virginia's broad statute prohibiting unlawful forms of debt collection happens to ensnare certain practices of national banks.

*Smith,* 769 F.Supp.2d at 1046.

The impact of the Dodd–Frank Act is addressed, *infra,* at 13.

## II.

### A. Governing Standard

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). A Rule 12(c) motion "is assessed under the same standard that applies to a Rule 12(b)(6) motion." *Walker v. Kelly,* 589 F.3d 127, 139 (4th Cir.2009); *Independence News, Inc. v. City of Charlotte,* 568 F.3d 148, 154 (4th Cir.2009) (citing *Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th Cir. 1999)).

Rule 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing ... entitle[ment] to relief." Fed.R.Civ.P. 8(a)(2); *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted...." Fed.R.Civ.P. 12(b)(6). The required "short and plain statement" must provide " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *overruled on other grounds, Twombly,* 127 S.Ct. at 1969); *see also Anderson v. Sara Lee Corp.,* 508 F.3d 181, 188 (4th Cir.2007). Additionally, the showing of an "entitlement to relief" amounts to "more than labels and conclusions...." *Twombly,* 127 S.Ct. at 1965. It is now settled that "a formulaic recitation of the elements of a cause of action will not do." *Id.; Giarratano v. Johnson,* 521 F.3d 298, 304 (4th Cir.2008).

As noted in *Iqbal,* the Supreme Court has consistently interpreted the Rule 12(b)(6) standard to require a district court to " 'accept as true all of the factual allegations contained in the complaint....' " *Erickson,* 127 S.Ct. at 2200 (quoting *Twombly,* 127 S.Ct. at 1965); *see also South Carolina Dept. of Health and Environmental Control v. Commerce and Industry Ins. Co.,* 372 F.3d 245, 255 (4th Cir.2004) (quoting *Franks v. Ross,* 313 F.3d 184, 192 (4th Cir.2002)). The court is additionally required to "draw[ ] all reasonable ... inferences from those facts in the plaintiff's favor...." *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir.1999).

### B. Preemption

#### 1. Introduction

As will become apparent, recent developments in the area of NBA preemption

necessitate a somewhat extended analysis. The court will first discuss the doctrine of preemption in general terms. A discussion of a statutory provision in the Dodd–Frank Act follows thereafter, specifically 12 U.S.C. § 25b, along with an amended set of regulations promulgated by the OCC referred to herein as the "Dodd–Frank Final Rule," the material portion being found at 12 C.F.R. § 7.4008. Both provisions became effective July 21, 2011.[2] The court next examines whether the Dodd–Frank Act statutory provision and Dodd–Frank Final Rule are properly considered in this action, which was filed prior to their effective date. The court will then next discuss the parameters of the conflict preemption analysis found in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996), which is now central to determining the scope of NBA preemption. Finally, the court will analyze whether Cline's claims are preempted according to the standards deemed controlling.

### 2. The Doctrine of Preemption Generally

■ The doctrine of preemption traces its roots to the Supremacy Clause. *See, e.g., Chicago and N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981); *PLIVA, Inc. v. Mensing*, —— U.S. ——, 131 S.Ct. 2567, 2577, 180 L.Ed.2d 580 (2011); *Barb-*

*our v. Intern. Union*, 640 F.3d 599, 618 (4th Cir.2011). There is, however, a "basic assumption [in preemption jurisprudence] that Congress did not intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981); *Southern Blasting Services, Inc. v. Wilkes County*, 288 F.3d 584, 589 (4th Cir.2002).

■ This is particularly so when it comes to the states' historical responsibility of protecting their citizens' health and welfare. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *Southern Blasting*, 288 F.3d at 590. In sum, "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 475, 116 S.Ct. 2240; *Smith*, 769 F.Supp.2d at 1038 (stating "[T]he presumption against preemption has full force here—even though the federal government has regulated national banks for more than a century—because the doctrine would displace state consumer-protection statutes, which fit squarely within the States' traditional police powers to protect the well being of their own citizens.").

In *Southern Blasting*, our court of appeals comprehensively summarized the

---

**2.** The Dodd–Frank Final Rule provides, in straightforward fashion, that its regulatory provisions are "effective on July 21, 2011...." Dodd–Frank Final Rule, 76 Fed. Reg. 43549–01, 43559 (Jul. 21, 2011). The same effective date for the relevant Dodd–Frank Act statutory provision, 12 U.S.C. § 25b, is a bit more difficult to discern.

Section 25b is found in the Revised Statutes of the United States at section 5136C. It is also found in Public Law 111–203 at Title X, Subtitle D. Subtitle D consists of sections 1041 through 1048, with the section 25b counterpart appearing at section 1044. Section 1048, the final section in Subtitle D,

provides as follows: "This subtitle shall become effective on the designated transfer date." Dodd–Frank Act, Pub.L. No. 111–203 § 1048. Section 1062(a) of Public Law 111–203 provides that "[n]ot later than 60 days after the date of enactment of th[e Dodd–Frank Act], the Secretary [of the Treasury]" shall select and "publish notice of" the designated transfer date in the Federal Register. *Id.* § 1062(a)(1) and (2). In September 2010, the Secretary of the Treasury determined that "the designated transfer date under section 1062(a) ... shall be July 21, 2011." 75 Fed. Reg. 57252–02 (Sept. 20, 2010).

three different types of ordinary preemption that apply:

> [T]here are several ways in which federal law may supersede state or local law. First, Congress may expressly preempt such laws. Second, in the absence of express preemptive language, Congress' intent to preempt state law may be implied when "federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." Finally, preemption will also be implied if state or local law "actually conflicts with federal law." Such a conflict occurs "when compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Southern Blasting*, 288 F.3d at 590 (citations omitted).

■ It has also been observed that both "federal statutes *and regulations* properly enacted and promulgated can nullify conflicting state or local actions." *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir.2007) (emphasis added); *National City Bank v. Turnbaugh*, 463 F.3d 325, 330 (4th Cir.2006); *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir.2005) (internal quotation marks omitted); *see also Williamson v. Mazda Motor of America, Inc.*, —— U.S. ——, 131 S.Ct. 1131, 1136, 179 L.Ed.2d 75 (2011) (citing *Fidelity Fed. Sav. & Loan Assn. v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982)).

### 3. The Dodd–Frank Act and the Amended Section 7.4008

The law has changed since the decisions in *Lomax* and *Smith*. On May 26, 2011, the OCC published a notice of proposed rulemaking in the *Federal Register*. The agency advised of its decision to amend the regulations governing, *inter alia*, preemption pursuant to the Dodd–Frank Act, Pub.L. 111–203, which was signed by the President on July 21, 2010. As earlier noted, the relevant provision of each the Dodd–Frank Act, section 25b, and the material portion of the Dodd–Frank Final Rule, section 7.4008, did not become effective until July 21, 2011.

The Dodd–Frank Act implements various financial regulatory reforms. One watershed addition to the national banking scheme is an entirely new provision dealing with NBA preemption:

> State consumer financial laws are preempted, only if—
>
> > application of a State consumer financial law would have a discriminatory effect on national banks, in comparison with the effect of the law on a bank chartered by that State;
> >
> > in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in *Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25[, 116 S.Ct. 1103, 134 L.Ed.2d 237] (1996), the State consumer financial law prevents or significantly interferes with the exercise by the national bank of its powers; and any preemption determination under this subparagraph may be made by a court, or by regulation or order of the Comptroller of the Currency on a case-by-case basis, in accordance with applicable law; or
> >
> > the State consumer financial law is preempted by a provision of Federal law other than title 62 of the Revised Statutes.

12 U.S.C. § 25b(b)(1)(A)-(C). In view of Dodd–Frank, some commentators have forecast the demise of the OCC's formerly more aggressive approach to preemption.

*See, e.g.*, Kurt Eggert, *Foreclosing on the Federal Power Grab: Dodd–Frank, Preemption, and the State Role in Mortgage Servicing Regulation*, 15 Chap. L.Rev. 171, (2010) ("Dodd–Frank significantly limits federal preemption of state consumer financial laws, even as to national banks and thrifts, and in many ways signals an explicit return to the law as it stood in the mid–1990s before the OTS and OCC made their preemption power grabs.").

Section 25b defines the term "state consumer financial law" as "a State law that does not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer." 12 U.S.C. § 25b(a)(2).

On the same date that section 25b became effective, OCC published a newly minted section 7.4008, with its principal preemption provision moved to subsection (e).[3] Subsection (e) provides as follows:

State laws on the following subjects are not inconsistent with the non-real estate lending powers of national banks and apply to national banks to the extent consistent with the decision of the Supreme Court in *Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25[, 116 S.Ct. 1103, 134 L.Ed.2d 237] (1996):

(1) Contracts;

(2) Torts;

(3) Criminal law . . . . ;

(4) Rights to collect debts;

(5) Acquisition and transfer of property;

(6) Taxation;

(7) Zoning; and

(8) Any other law that the OCC determines to be applicable to national banks in accordance with the decision of the Supreme Court in *Barnett Bank of Marion County, N.A. v. Nelson, Florida Insurance Commissioner, et al.*, 517 U.S. 25[, 116 S.Ct. 1103, 134 L.Ed.2d 237] (1996) or that is made applicable by Federal law.

12 C.F.R. § 7.4008(e) (footnote omitted).

OCC has thus clarified its former approach to preemption. No longer is the focus upon whether, for instance, a state law (1) "obstruct[ed], impair[ed], or condition[ed] a national bank's" full exercise of its lending powers, or (2) more than "incidentally affect[ed]" the exercise of such powers. State statutes having an effect on national banks will now essentially stand or fall based upon application of the principles found in *Barnett Bank. See* Dodd–Frank Final Rule, 76 Fed.Reg. 43549–01 (Jul. 21, 2011) (noting certain regulatory amendments, including the deletion of the "obstruct, impair, or condition" language, "will remove any ambiguity that the conflict preemption principles of the Supreme Court's *Barnett* decision are the governing standard for national bank preemption.").

4. Applicability of Section 25b and Amended Section 7.4008 To This Action

As noted, section 25b and the amended version of section 7.4008 found in the Dodd–Frank Final Rule became effective after the institution of this civil action. The court must thus determine if the amended statute and regulation properly govern here or, instead, represent retroactive, substantive law that should not be considered.

---

**3.** Subsection (d) deals with preemption as well. It provides that a "national bank may make non-real estate loans without regard to state law limitations concerning" certain matters that are not here involved. The court thus focuses upon subsection (e).

■ As has also been noted, the material portions of the Dodd–Frank Act became effective July 21, 2011. The court observes, however, that section 1043 of the Dodd–Frank Act, codified at 12 U.S.C. § 5553, provides as follows:

This subchapter, and regulations, orders, guidance, and interpretations prescribed, issued, or established by the Bureau [of Consumer Financial Protection], shall not be construed to alter or affect the applicability of any regulation, order, guidance, or interpretation prescribed, issued, and established by the Comptroller of the Currency ... regarding the applicability of State law under Federal banking law *to any contract entered into on or before July 21, 2010, by national banks* ... that are regulated and supervised by the Comptroller of the Currency. . . .

12 U.S.C. § 5553 (emphasis added). Despite the fact that this section of Title 12 is far removed from section 25b in the codified laws represented by the *United States Code*, the two sections appear adjacent to one another in Public Law 111–203. Section 25b appears at section 1044 and section 5553 is found at section 1043. Additionally, the two opening words to section 5553 in the Statutes at Large are "This title" as opposed to the words "This subchapter" found in the codified law.

Even assuming that section 5553 might be construed to extend to section 25b, and the amended version of section 7.4008, it is immaterial for present purposes. The underscored language above in section 5553 was intended to preserve existing contracts by national banks, not to effectively insulate those institutions from generally applicable state consumer protection actions aimed at postcontractual collection activities.

■ Neither does application of the statutory provision and regulatory amendment offend settled retroactivity principles. Our court of appeals discussed the general framework for a retroactivity analysis in *Chambers v. Reno*, 307 F.3d 284 (4th Cir.2002).

A new statute does not produce a retroactive effect "merely because it is applied in a case arising from conduct antedating the statute's enactment." The question instead is "whether the new provision attaches new legal consequences to events completed before its enactment." A statute would attach new legal consequences to prior events if its application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."

*Id.* at 289 (citations omitted).

There is no indication that section 25b or the amended regulation have somehow impaired BOA's rights, increased its liability, or imposed new duties upon it. The present controversy involves only the question of NBA preemption of Cline's claims, a matter of significant controversy even prior to the recent amendments, as reflected by the decisions in *Lomax, In re Jones,* and *Smith.* The recent amendments are better understood as clarifications of the law as opposed to substantive changes thereof. As such, their application here does not work an impermissible retroactive effect. *See Brown v. Thompson,* 374 F.3d 253, 259 (4th Cir.2004). The court thus applies the recent amendments herein.

### 5. The *Barnett Bank* Preemption Standard

Inasmuch as section 25b and section 7.4008 are deemed applicable to this case, both must be scrutinized in order to resolve the preemption controversy. At the outset, it is noted that both provisions explicitly reference the Supreme Court's decision in *Barnett Bank.* An understand-

ing of that case is thus essential in assessing the present scope of NBA preemption.

In *Barnett Bank*, the Supreme Court addressed whether a federal statute permitting national banks to sell insurance in small towns preempted a state statute forbidding as much. The Supreme Court applied conflict preemption principles in reaching its conclusion that the federal act preempted its state counterpart:

> In this case we must ask whether or not the Federal and State Statutes are in "irreconcilable conflict." The two statutes do not impose directly conflicting duties on national banks-as they would, for example, if the federal law said, "you must sell insurance," while the state law said, "you may not." Nonetheless, the Federal Statute authorizes national banks to engage in activities that the State Statute expressly forbids. Thus, the State's prohibition of those activities would seem to "stan[d] as an obstacle to the accomplishment" of one of the Federal Statute's purposes—unless, of course, that federal purpose is to grant the bank only a very limited permission, that is, permission to sell insurance to the extent that state law also grants permission to do so.

*Barnett Bank*, 517 U.S. at 31, 116 S.Ct. 1103 (noting state authority to "regulate national banks, where (unlike here) doing so does not prevent or significantly interfere with the national bank's exercise of its powers."); *see also, e.g., Anderson Nat. Bank v. Luckett*, 321 U.S. 233, 247-52, 64 S.Ct. 599, 88 L.Ed. 692 (1944) (state statute administering abandoned deposit accounts did not "unlawful[ly] encroac[h] on the rights and privileges of national banks"); *McClellan v. Chipman*, 164 U.S. 347, 358, 17 S.Ct. 85, 41 L.Ed. 461 (1896) (allowing application to national banks of state statute forbidding certain real estate transfers by insolvent transferees, noting the practice would not "destro[y] or

hampe[r]" national banks' functions); *National Bank v. Commonwealth*, 76 U.S. (9 Wall.) 353, 362, 19 L.Ed. 701 (1869) (national banks subject to state law that does not "interfere with, or impair [national banks'] efficiency in performing the functions by which they are designed to serve [the Federal] Government") (all cited in *Barnett Bank*, 517 U.S. at 33-34).

The conflict preemption analysis prescribed by *Barnett Bank* is the same as that applied in *Smith*. *See, e.g., Smith*, 769 F.Supp.2d at 1044 ("I ... am convinced that only conflict preemption applies.... Because neither field preemption nor express preemption is applicable, I will restrict my analysis to whether the plaintiff's WVCCPA claims are preempted under principles of conflict preemption.").

The decision in *Smith* went so far as to cite *Barnett Bank* for the proposition that "conflict preemption has always been ensconced in the NBA's regulatory scheme, because the NBA's statutory grants of authority, whether specifically enumerated or merely incidental to other powers, have been universally understood as not being 'limited by, but rather ordinarily preempting, contrary state law.'" *Smith*, 769 F.Supp.2d at 1042 (quoting *Barnett Bank*, 517 U.S. at 32, 116 S.Ct. 1103). The recent statutory and regulatory amendments demonstrate the prescience of that approach.

■■ Based upon the foregoing discussion, the *Barnett Bank* conflict preemption analysis is focused on whether the targeted state statute is irreconcilably in conflict with the NBA. Stated another way, the inquiry under *Barnett Bank* distills to whether the state measure either (1) imposes an obligation on a national bank that is in direct conflict with federal law, or (2) stands as an obstacle to the accomplish-

ment and execution of the full purposes and objectives of Congress.[4]

### 6. Analysis of Cline's Claims in Light of Section 25b

■ Having now assembled the necessary analytical tools, the court first examines the relevant provisions of section 25b, which are set out *supra* at page 394. The statute represents Congress' line in the sand respecting how far the states might go in regulating national banks. The "[p]reemption standard" found in section 25(b), however, appears rather narrow. The provision is concerned only with "state consumer financial laws." If a state statute does not qualify as such, it is not preempted thereunder by the NBA.

The first statutory prerequisite for a "state consumer financial law" is that it "not directly or indirectly discriminate against national banks...." That is true of West Virginia Code sections 46A–2–125(d), 46A–2–126(a), and 46A–2–128(e), which apply generally to "debt collectors." West Virginia Code § 46A–2–122(d) defines "debt collectors" broadly as "any person or organization engaging directly or indirectly in debt collection." Cline's common-law claims likewise possess a non-discriminatory flavor. They are not dependent upon the defendant having national bank status.

The somewhat more difficult question is whether the aforementioned sections of the WVCCPA satisfy the balance of the

"state consumer financial law" definition, namely, whether the state statutes "directly and specifically regulate[ ] the manner, content, or terms and conditions of any financial transaction (as may be authorized for national banks to engage in), or any account related thereto, with respect to a consumer." It might be said, for instance, that a national bank's repeated dunning of a consumer debtor on a loan obligation could smack of regulating the manner or terms of the consumer's account relating to the parties' original financial transaction.

That interpretive stretch breaks down, however, with the hemming accomplished by the statutory terms "directly and specifically." The aforementioned provisions of the WVCCPA were not designed to directly and specifically regulate financial transactions or related accounts. They are instead focused on protecting West Virginia residents from unfair and abusive collection practices. As such, they do not fall within the definition of "state consumer financial laws." *See* Jared Elosta, *Dynamic Federalism and Consumer Financial Protection: How the Dodd–Frank Act Changes the Preemption Debate*, 89 N.C. L.Rev. 1273, 1297 (2011)(noting that the section 25b focus on "state consumer financial laws" necessarily "means that the preemption provisions in Dodd–Frank do not apply to basic contract laws or unfair and deceptive acts or practices laws, which

---

4. Some courts have further elaborated on the appropriate standard based upon their reading of *Barnett Bank. See, e.g., Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194, 1197 (11th Cir.2011) ("In determining whether there was an 'irreconcilable conflict' [in *Barnett Bank*] between the state statute and the NBA, the Court found the controlling question to be whether the state statute "forbid[s], or ... impair[s] significantly, the exercise of a power that Congress explicitly granted." Thus it is clear that under the Dodd–Frank Act, the proper preemption test asks

whether *there is a significant conflict between the state and federal statutes*—that is, the test for conflict preemption.") (emphasis added) (citation omitted); *U.S. Bank Nat. Ass'n v. Schipper*, 812 F.Supp.2d 963, 968, 2011 WL 4347892, at *4 (S.D.Iowa Aug. 29, 2011) ("To determine whether the NBA preempts the Iowa EFTA in the context at issue in this case, the Court must determine whether (1) U.S. Bank seeks to exercise an authorized power under the NBA, and (2) if so, whether the exercise of that power has been prevented or significantly impaired by the Iowa EFTA.").

have traditionally been excluded from federal preemption."). The same analysis applies to Cline's common-law claims.

The court, accordingly, concludes that none of Cline's claims are preempted by section 25b.

### 7. Analysis of Cline's Claims in Light of the Amendment to Section 7.4008

In analyzing the newly amended section 7.4008, it is clear that OCC, like Congress, tied preemption to the *Barnett Bank* standard. If a state statute affecting a national bank does not offend the principles espoused in *Barnett Bank*, it necessarily does not offend section 7.4008. The question is whether Cline's claims (1) impose an obligation that is in direct conflict with federal law, or (2) stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

It is clear enough that "Congress gives national banks general authority to 'exercise all such incidental powers as shall be necessary to carry on the business of banking.'" *Turnbaugh*, 463 F.3d at 329 (quoting 12 U.S.C. § 24). Those powers would seem to include the ability to collect debts. So the question is the extent to which the state laws under consideration here impact that power. With respect to the first inquiry, BOA has not identified any direct conflict. The court does not discern one. As to the second inquiry, there is likewise no indication that generally applicable restrictions upon (1) annoying and abusive collection calls, (2) disclosing indebtedness to an employer or agent, or (3) calling those consumer debtors represented by counsel interfere in any way, much less a significant way, with the purposes and objectives of federal law. The same is said with respect to the effects stemming from Cline's common-law claims.

The court, accordingly, is unable to find that the law underlying any of Cline's claims conflicts with federal law according to the *Barnett Bank* standard. Based upon the foregoing discussion, Cline's claims are not preempted by the NBA.

### C. BOA's Remaining Challenges

Apart from its preemption defense, BOA asserts that many of Cline's claims are subject to dismissal pursuant to Rule 12(c) for other reasons. The court has reviewed the contentions, none of which warrant judgment on the pleadings. Following the conclusion of discovery, BOA may reassert its challenges in accordance with the standards governing summary judgment.

### III.

Based upon the foregoing discussion, it is ORDERED that BOA's motion for judgment on the pleadings be, and it hereby is, denied.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record and any unrepresented parties.